**In the Interest of F.B.**

**Appeal of F.B.**

Supreme Court of Pennsylvania.

Argued Oct. 15, 1996.
Decided March 2, 1999.

---

14. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case back to the Governor. 42 Pa.C.S. § 9711(*l*).

John W. Packel, Jeffrey P. Shender, for F.B.

Catherine Marshall, Thomas W. Dolgenos, Philadelphia, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

The question before the court is whether a knife seized from appellant, a high school student, during a search for weapons conducted as a pre-condition to entry for all students at University High School in Philadelphia, should be suppressed. Appellant challenges the constitutionality of the search as it took place in the absence of individualized reasonable suspicion. As we find that the search of the student population, as conducted herein, affected a limited privacy interest, was minimally intrusive, was preceded by adequate notice, was motivated by a significant policy concern, and was directed towards an immediate need, individualized reasonable suspicion was not a necessary precondition to the search. Accordingly, the search was constitutional, the suppression of the knife was not warranted, and thus, the decision of the Superior Court is affirmed.

The record reveals that appellant was subject to a point of entry search upon entering University High School in the City of Philadelphia on October 14, 1993. It is the policy of University High School to conduct, in certain circumstances, periodic weapons searches of the entire student population. The search policy and procedures are set forth in the manual of the School District of Philadelphia. The students and their parents are notified before the beginning of the school year that all students may be subject to a search upon entering the University High School building on any given day as a pre-condition to attending school. Notices setting forth the search policy are posted prominently throughout the school and mailed home on a regular basis.

The search is conducted as a point of entry search. All students are required to stand in line before a table and empty their pockets while their backpacks, coats, etc. are searched. The students are each scanned by a hand-held metal detector before being permitted to enter the school. When the search area becomes too crowded, students are chosen at random by school administrators to be searched while the remaining students are excused from the search process and permitted to enter the building proper.[1] The actual searches are conducted by officers of the Philadelphia Police Department on detail to and under the direction of the Philadelphia Public Schools.[2]

On October 14, 1993 appellant was searched upon entering the University High School building. During the search appellant emptied his pockets. Among the items removed from his pocket was a Swiss army type knife with approximately a three inch blade. Appellant was taken to the school office where he was arrested for bringing a weapon onto school property. 18 Pa.C.S. § 912.[3]

---

1. Random selection is not an issue in this case as appellant does not assert that he was "randomly" selected for search on October 14, 1993.

2. Although the actual searches are conducted by police officers, the officers are acting under the direction of the school administrators, thus, the search is a "school" search not a police action.

3. 18 Pa.C.S. § 912 provides:

**Possession of weapon on school property**

(a) **Definition.-** Notwithstanding the definition of "weapon" in section 907 (relating to possessing instruments of crime), "weapon" for purposes of this section shall include but not be limited to any knife, cutting instrument, cutting tool, nun-chunk stick, firearm, shotgun, rifle and any other tool, instrument or implement capable of inflicting serious bodily injury.

(b) **Offense defined.-** A person commits a misdemeanor of the first degree if he possesses a

As appellant was a juvenile at the time of the offense, a proceeding in Juvenile Court was held where appellant was adjudicated delinquent. At the juvenile hearing appellant moved to suppress the knife, arguing that the search was undertaken without individualized reasonable suspicion to believe that appellant was in violation of any school regulations at the time of the search.[4] The trial court denied the motion to suppress finding that the search was justified as a reasonable response to the increased rate of violence in the Philadelphia Public Schools. The Superior Court affirmed. This court granted appellant's Petition for Allowance of Appeal.

▮▮▮ Appellant challenges the constitutionality of the October 14, 1993 search arguing that he was subject to a search without individualized reasonable suspicion justifying the intrusion. Appellant raises this challenge under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[5] A similar challenge to a search aimed at the entire student population within a public school was brought before this court in *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998).[6] As this court recognized in *Cass*, general searches within the school environment do not offend the Fourth Amendment where the search meets the reasonableness test as set forth in *Vernonia School District 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct.

2386, 2390, 132 L.Ed.2d 564, 573 (1995). The three factors to be weighed and balanced in reviewing the constitutionality of a general search under the Fourth Amendment are: 1) the nature of the privacy interest upon which the search at issue intrudes, 2) the character of the intrusion, and 3) the nature and immediacy of the governmental concern and the efficacy of the means utilized to address that concern. *Acton*, 515 U.S. at 654, 115 S.Ct. at 2391, 132 L.Ed.2d at 575.

This court in *Cass* was unable to agree upon a definitive framework for the analysis of such searches under the Pennsylvania Constitution. The major point in contention among the members of this court was the concept of general searches. The Opinion Announcing Judgment found authority for general searches in Pennsylvania by reference to *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) and *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992). The two justices in the concurrence found the concept of general searches abhorrent to Pennsylvania constitutional law, however they agreed that such searches would be constitutional under certain conditions within the school environment given the *sui generis* context of that environment.

▮▮▮ Thus, in order to understand which factors a court should consider when reviewing the constitutionality of a school search directed at the entire student population under the Pennsylvania Constitution, we must

---

weapon in the buildings of, on the grounds of, or in any conveyance providing transportation to or from any elementary or secondary publicly-funded educational institution, any elementary or secondary private school licensed by the Department of Education or any elementary or secondary parochial school.

(c) **Defense.**- It shall be a defense that the weapon is possessed and used in conjunction with a lawful supervised school activity or course or is possessed for other lawful purposes.

4. Appellant also objected to the sufficiency of the evidence, arguing that a Swiss army knife with a three inch blade is not a weapon. The trial court rejected this argument and the issue was not preserved for appeal.

5. Contrary to the holding of the Superior Court, appellant's challenge under the Pennsylvania Constitution was not waived for failure to perform an analysis pursuant to the framework set forth in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). As this court has stated,

*Edmunds* provides a framework for a distinct analysis of a claim under the Pennsylvania Constitution in contrast to a claim under the United States Constitution, **not the only** framework for such an undertaking. *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 898 (1996).

6. *Cass* is a plurality opinion. The Opinion Announcing the Judgment of the Court was authored by this Justice and joined by Mr. Justice Castille and Madame Justice Newman. Mr. Chief Justice Flaherty authored a Concurring Opinion, in which he agreed that the search as conducted did not violate either the Fourth Amendment to the United States Constitution or Article 1, Section 8 of the Pennsylvania Constitution. However, the concurrence reached its decision under the Pennsylvania Constitution on other grounds. Mr. Justice Nigro joined the concurring opinion. Mr. Justice Zappala filed a dissenting opinion. Mr. Justice Saylor did not participate in the decision.

isolate the points upon which the opinion announcing the judgment of the court and the concurring opinion agreed. Having reviewed the two opinions those factors can be identified as follows: 1) a consideration of the students' privacy interest, 2) the nature of the intrusion created by the search, 3) notice, and 4) the overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search.

■ A comparison of the factors identified as necessary to an analysis of a school search under the Pennsylvania Constitution with the factors set forth in *Acton* reveals a great similarity. However, the unique policy concerns safeguarding the individual right to privacy in Pennsylvania brings a greater degree of scrutiny to all searches where the protection of Article I, Section 8 is invoked. *See, Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1996); *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991); *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983); and *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979). Given this tradition of a heightened privacy interest under Pennsylvania law, and the fact that a majority of this court is only willing to tolerate searches of this generic nature within the school environment, we find that if a search within the school environment passes constitutional muster under Article I, Section 8, that search will also satisfy the reasonableness test of the Fourth Amendment set forth in *Acton*. Having identified the necessary framework for our analysis we now turn to a consideration of whether the search at issue satisfies the requirements of that framework.

■ We begin with a consideration of the level of personal privacy a public school student can reasonably expect within the public school setting. Although students possess a legitimate expectation of privacy concerning their person and personal belongings, that privacy right is limited. *New Jersey v. T.L.O.*, 469 U.S. 325, 341–42, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Cass*, 709 A.2d at 360. "The need to protect all students, to ensure school discipline, and protect school property, limits the student's expectation of privacy while in the school environment." *Cass*, 709

A.2d at 360. In *Cass* the focus was on a student's privacy interest in a school locker. There the court found that "although the students ... do possess a legitimate expectation of privacy in their assigned lockers, that privacy expectation is minimal." *Id.*

In the case *sub judice* the search is not of a locker. The students themselves are subject to search by a scan of their bodies via a hand-held metal detector. The students' book bags, purses and coats are physically inspected and each student is required to empty the items in their pockets for examination. The privacy interest at stake herein is obviously higher than the minimal expectation of privacy a student possesses in a school locker.

■ The search of a person always involves a greater degree of intrusion upon one's privacy interest than the search of a thing. *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556, 560 (1993). The distinguishing factor in comparing the search here with the one in *Cass* is the extension of the search beyond things in the student's possession to the students themselves. However, looking to the *Cass* decision for guidance, we recognize that the search of school lockers obviously extends to an inspection of personal items within the lockers, including, but not limited to, book bags, purses and coats. Given that the same personal items were subject to search if found in a locker, it would be illogical to find a greater privacy interest at stake in searching those personal items outside a locker.

A determination of whether the increased privacy interest involved in a search of the student himself bars the type of search at issue here, necessitates a consideration of the second factor identified in our analytical framework: the nature of the intrusion created by the search. We note that this court has identified the framework for our analysis as involving four distinct factors, but the analytical process requires consideration of these factors in concert, not in isolation.

■ Although the search at issue is described as a search of the person, that would be a literal description of the search, not a common sense depiction of the actual pro-

cess. The students do not suffer physical intrusion during the search. A hand-held metal scanner is passed over the students' outer clothing. The actual character of the intrusion suffered by the students during the search is no greater than that regularly experienced by millions of people as they pass through an airport. In addition to metal detectors and X-ray machines in airports, we would be remiss if we did not acknowledge the proliferation of electronic weapon scanners now commonly placed throughout a wide array of government buildings. The prevalence and general acceptance of metal scanners in today's society underscores the minimal nature of the intrusion occasioned by this manner of search. Thus, although we acknowledge that a search of a student involves a greater intrusion of the student's privacy interest than a search of a school locker, where the character of the intrusion is non-invasive such as here, the intrusion remains minimal.[7]

 It could be argued that the installation of walk-through metal detectors and X-ray machines at points of entry for the purpose of inspecting book bags, purses, etc., would be a less intrusive and more efficient means of achieving the goal of keeping weapons out of the schools than the physical inspection of personal items and the use of hand held scanners. However, a search will not be barred because less intrusive means exist than those actually utilized if the means, as employed, are not so expansive as to be disproportionate to the purpose of the search. *Acton*, 515 U.S. at 663, 115 S.Ct. at 2395, 132 L.Ed.2d at 581.

The third factor meriting consideration in our analysis is notice. The Philadelphia Public School Policy and Procedure Manual sets forth the criteria which must be present before a point of entry weapons search can

proceed, and the manner for conducting the actual search.[8] In addition to the Manual, notices are routinely mailed to the students' homes and posted prominently throughout the school building.

The fact that notice is provided of the reason for the search policy and the manner of conducting the search provides an additional safeguard for a search of this nature. The students subject to the search are forewarned of the purpose of the search—to eliminate weapons from the school environment. Also, by outlining in detail the manner of the search the students are fully prepared for the process and made aware of the scope of that process. This provides a check on those conducting the search not to exceed their limited authority. The detailed policy and procedures of the Philadelphia School Code provide sufficient notice of the reasons for and the manner of conducting point of entry weapons searches within the school environment.

The final factor weighing in on the analysis of this search is: the overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search. In *Cass* this court had the benefit of a record hearing where the principal of Harbor Creek High School set forth in great detail the heightened awareness of drug activity permeating throughout the entire school population, describing both the nature of the danger to the students and the immediate need to address the problem. The record in the case *sub judice* is silent as to the reasons University High School administrators believed a policy of point of entry weapons searches was necessary, and why the administrators at University High School believed it was necessary to conduct a point of entry weapons search on October 14, 1993. However, we do not believe the ab-

7. However, we emphasize that if the means used to conduct the search become oppressive then no matter how important the interest motivating the search, it would be expected that the individual's right of privacy must prevail.

8. Although not a part of the record, this court can take judicial notice of the Philadelphia School Code Policy and Procedure Manual for school searches as such document is a public record. We note that the manner of conducting

an administrative entry ·search as undertaken herein is explicitly set forth in the School District of Philadelphia Policy and Procedure Manual. As no objection was made by appellant to the method of search at the suppression hearing, we must assume for the purpose of this opinion that the procedures as set forth in the manual were followed. (See pp. 8–13 of the School District of Philadelphia Policy and Procedures Manual).

sence of a record on this point is fatal to our review.

The Philadelphia Public School Code sets forth the criteria for point of entry weapons searches. The policy and procedure manual of the School District of Philadelphia provides in pertinent part:

C. *Administrative/Entry Searches* (Metal Detectors)

In order to attempt to reduce or discourage the presence of weapons the Board of Education has authorized the use of metal detectors in certain circumstances where a heightened danger to students and staff justifies a limited intrusion into a student's personal privacy.

1. *Criteria*

 (a) When school staff or District staff become aware of information or circumstances which indicate a significantly increased likelihood that students may be armed or headed for physical confrontation because of neighborhood strife or tensions, or as a continuation or escalation of a prior incident, in or out of school, which threatens to spill over into school, a school program or school bus, the school principal may initiate the procedures below.

Although no specific information is set forth in this record as to the circumstances which prompted the point of entry search at University High School on October 14, 1993 from which this court could properly review the immediacy of the need for said search, the absence of such specifics does not preclude a consideration of the overall purpose of such a search. The interest in keeping weapons out of public schools is a matter so obvious that the need to develop a record on this point is superfluous. There can exist no

logical argument opposing the decision of a public school board to prohibit students, or anyone else, from entering a school with weapons in their possession. The myriad of interests at issue include the physical safety of the school students, teachers, administrators and other employees, the public concern of eliminating violence in the community in general and in the schools in specific, and the need to maintain schools as centers of learning free of fear for personal safety.

Furthermore, it is exceedingly important to understand that first and foremost, the citizens of this Commonwealth entrust the safety and welfare of their children to school officials each time a student crosses the threshold of the school building. Thus, the primary object of the search, to remove weapons from students, comports with the duty and responsibility of the school administrators to keep their charges safe while in the school environment. *Cass,* 709 A.2d at 365 (concurring opinion). Simply stated, guns, knives, or other weapons, have no place in the public school setting.[9]

Thus, a record is not necessary in order for this court to recognize the compelling concern for the protection of the students at issue. Recognition of the importance of keeping weapons out of the public school environment does not satisfy the inquiry as to the immediacy of the need to search for weapons on October 14, 1993. In response to this concern the trial court took judicial notice of the increased rate of violence within the Philadelphia Schools. Given this alarming trend of increased violence we find that an immediate need to take precautionary measures exists. The Schools are simply not required to wait for a tragedy to occur within their walls to demonstrate that the need is immediate. This court is loathe to assume that a Public School entrusted with educating

9. For information and statistics regarding juvenile violence and its impact in our public schools see: *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (Breyer, J. dissenting) (cataloging the widespread, serious and substantial threat to teaching and learning caused by gun related school violence); *"Expelled. No excuses. No Exception."—Michigan's Zero Tolerance Policy in Response to School Violence,* 74 U. Det. Mercy L.Rev. 357 (1997); *Safe Enough to Learn: Placing an Affirmative Duty of* *Protection on Public Schools Under 42 U.S.C. § 1983,* 30 Harv. C.R.-C.L. L.Rev. 169 (1995); *Notes: "Annie Get Your Gun 'Cause Help Ain't Comin' ": The Need For Constitutional Protection From Peer Abuse in Public Schools,* 43 Duke L.J. 588 (1993); *School Violence: Protecting our Children and the Fourth Amendment,* 41 Cath. U.L.Rev. 817 (1992); *Note: School Metal Detector Searches and the Fourth Amendment: An Empirical Study,* 19 U. Mich. J.L. Ref. 1037 (1986).

and protecting its students would lightly undertake a massive point of entry weapons search without immediate need.

Accordingly, we conclude that the search of appellant at University High School on October 14, 1993 meets the minimum requirements for constitutionality under both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. The search affected a limited privacy interest, it was minimally intrusive, notice of the purpose of the search and the manner of search was provided to the student population, parents and community, the purpose for the search was compelling and the immediate need to conduct the search was not objected to by appellant. We reiterate that our affirmance of the constitutionality of this search under the Pennsylvania Constitution is limited to the *sui generis* school environment.

Because the search herein was conducted as a search of all students, no individual finding of reasonable suspicion directed at appellant is necessary to a determination of the constitutionality of the search. Appellant's specific claims of error are denied.

The decision of the Superior Court is affirmed.

Chief Justice FLAHERTY files a Concurring Opinion.

Justice NIGRO concurs in the result.

Justice ZAPPALA files a Dissenting Opinion.

FLAHERTY, Chief Justice, concurring.

I join the majority opinion but write separately to emphasize some points of disagreement.

First, I cannot agree that the intrusion was minimal. When one is forced to empty his pockets and to have his coat and baggage searched, the intrusion is anything but minimal. And contrary to the majority, I do not regard the frequent usage of metal detectors

in our society as so generally accepted. Op. at 366. Nonetheless, I agree that the search does not offend the constitution of Pennsylvania. As I stated in *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998), the school environment is unique. In schools, students are required to be present and their parents have the reasonable expectation that they will not be harmed while there; in both *Cass* and in this case there was prior notice of the search; the society of children justifies certain governmental oversight not justifiable in the society of adults, and the purpose of the search as articulated in the policy and procedure manual of the Philadelphia School District was reasonably related to the method utilized. Thus, while the search was intrusive, it was not unreasonably related to the purposes for which it was conducted.[1]

Second, I disagree that there was a sufficient justification for the search based on judicial notice of increased violence. The record in this case contains nothing as to the reasons for conducting this particular search, and as the majority correctly notes:

> Recognition of the importance of keeping weapons out of the public school environment does not satisfy the inquiry as to the immediacy of the need to search for weapons on October 14, 1993.

Op. at 367. The majority then concludes that because the trial court took judicial notice of the increased violence in Philadelphia schools, the search was properly motivated. I disagree that this is an acceptable statement of justification of the search. Such reasons are always given when the government wishes to intrude. But such reasons are always insufficient. They are sufficient here only because they are not challenged.

Third, I am disturbed by the "weapon" in this case, a Swiss army knife. Again, because there was no challenge on appeal to the sufficiency of evidence that a Swiss army knife is a "weapon," we may not here reach that issue. The significance of the issue, however, is hinted at in the majority opinion, where it is suggested that if the means to

---

**1.** These concerns are consistent with the majority's four factors at Op. 365:

1) a consideration of the students' privacy interest, 2) the nature of the intrusion created by

the search, 3) notice, and 4) the overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search.

conduct the search become oppressive, the importance of the purpose will not save the search from being characterized as unconstitutional. Op. at 366, n.7. I would add to this that if the items seized become oppressive, the search itself may be regarded as an instrument of oppression and unconstitutional regardless of its purpose. 18 Pa.C.S. § 912 prohibits the possession of "any ... tool, instrument or implement capable of inflicting serious bodily injury." If Swiss army knives are to be seen as weapons, one must inquire whether objects which may be thrown, such as staplers, or objects which may be thrust, such as pointers, or objects which may be swung as clubs, such as the light steel and wood chairs used in classrooms, are not also weapons. And if they are, then what is the justification for criminal prosecution for possession of a Swiss Army knife but not for possession of one's classroom chair.

Some school officials appear to have taken leave of their senses. Newspaper stories report incidents of grade school children being expelled when a toy gun is found in a bookbag or incidents in which young women suffering menstrual cramps have been expelled for having Tylenol or aspirin on their persons. I realize that the neither the knife in this case nor the toy guns or aspirins of other cases are at issue here, but the legal principle is that when searches are conducted in such a way that such items as these are seized and children or young adults are penalized because they possessed such items, the searches themselves become suspect.

ZAPPALA, Justice, dissenting.

Members of the Philadelphia Police Department went to University High School and required students to empty their pockets while their backpacks, coats, and other personal items were searched. The majority concludes that such conduct was not police action. I must respectfully disagree. I find it inconceivable to deny that these facts clearly constituted police action. The police lacked any individualized suspicion justifying the search of Appellant, F.B., and the students were compelled to submit to such a search because of the compulsory education laws. I conclude that such police conduct offended both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

The majority reasons that if a search in a school environment passes constitutional muster under our state constitution, then "that search will also satisfy the reasonableness test of the Fourth Amendment set forth in *Acton.*" Majority Op. at 365, *citing, Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). At the outset, I do not believe that *Acton* controls the analysis of the search here for purposes of the Fourth Amendment. Indeed, the majority fails to recognize that the United States Supreme Court has never handed down a decision involving the validity of a search conducted by *police* on school grounds.[1]

*Acton* involved urine samples taken by school officials and parents for purposes of determining whether students would be eligible to participate in voluntary, interscholastic athletic events. In reaching its conclusion permitting the urine tests, which are deemed searches under the Fourth Amendment, the *Acton* Court specifically relied upon the fact that the test results were "disclosed only to a limited class of school personnel who have a need to know; *and they are not turned over to law enforcement authorities or used for any internal disciplinary function.*" *Acton,* at 658, 115 S.Ct. 2386 (emphasis added). In contrast, the case before this Court today involves compulsory searches conducted by police officers, the fruits of which are used in

1. The U.S. Supreme Court explicitly recognized this in *New Jersey v. T.L.O.,* 469 U.S. 325, 340 n. 7, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), the only other case from that Court addressing searches of students on school grounds, when it stated "[w]e here consider only searches carried out by school authorities acting alone and on their own authority. This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question." The Court then cited *Picha v. Wielgos,* 410 F.Supp. 1214, 1219–1221 (N.D.Ill. 1976) (holding that probable cause standard is applicable to search of school involving the police), for purposes of comparison.

criminal proceedings against students. In this case, the fruits of the searches did not need to be turned over to law enforcement authorities because the law enforcement authorities themselves conducted the searches. It could hardly be clearer that *Acton* does not govern these facts.

It is also significant that, under the facts of *Acton*, only six of the nine justices were willing to allow *school officials* to search students where there was an absence of individualized suspicion. Moreover, Justice Ginsburg wrote a concurring opinion explicitly stating, "I comprehend the Court's opinion as reserving the question whether the District, on no more than the showing here, constitutionally could impose routine drug testing not only on those seeking to engage with others in team sports, but on all students required to attend school." *Acton*, 115 S.Ct. at 2397 (Ginsburg, J., concurring). Justice Ginsburg went on to cite language used by Judge Friendly in *United States v. Edwards*, 498 F.2d 496 (2nd Cir.1974), which contrasted airport searches of passengers and luggage, which are easily avoidable "by choosing not to travel by air," with unavoidable, unannounced school searches. The concerns expressed by Justice Ginsburg are precisely implicated by the facts of our case today. The students at University High were unaware of when the search would take place and, even more obviously, the students had absolutely no ability to avoid the search because their attendance at school is required by law.

In her dissenting opinion, Justice O'Connor recognized that while students in a school setting may not enjoy the level of protection from unreasonable searches provided by the traditional probable cause standard, those students should not be stripped of the Fourth Amendment's "most basic, categorical protection: its strong preference for an individualized suspicion requirement, with its accompanying antipathy toward personally intrusive, blanket searches of mostly innocent people." *Acton*, at 666, 115 S.Ct. 2386 (O'Connor, J., dissenting, joined by Justices Stevens and Souter). It is exactly that type of suspicionless search that occurred in this case. Thus, a consideration of the concurring and dissenting opinions in *Acton*, in conjunction with the *Acton* majority's explicit distinction between searches conducted by school officials and searches conducted by law enforcement officials, leads me to conclude that this search violated the federal constitution.

Supporting my belief that the search at issue violated the federal constitution is my finding that the lesser degree of constitutional protection afforded students in what has come to be called the "*sui generis* school setting" does not operate under facts where the police enter upon school grounds to conduct searches.[2] *New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (establishing reasonableness, rather than probable cause, as the standard for assessing the validity of searches conducted by school officials in a school setting). Once the police enter school grounds, the bases for

**2.** It is disconcerting that this is the second decision from this Court in approximately one year characterizing the school setting as unique and upholding searches on school grounds. In *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998), a majority of this Court decided that the use of drug sniffing dogs, the search of students' lockers, and the search of the belongings within those lockers, was not unconstitutional notwithstanding the absence of any individual suspicion. Today, the majority extends that aberration from normal constitutional protections by asserting that "[g]iven that the same personal items were subject to search if found in a locker, it would be illogical to find a greater privacy interest at stake in searching those personal items outside a locker." Majority Op. at 365. While the majority's language has superficial appeal, it conveniently overlooks the fact that "outside the locker" in

this case refers to "on the persons themselves." Here the purses and pockets that are searched are taken from the individuals themselves rather than from their lockers. Not only does common understanding dictate that an individual has the greatest expectation of privacy in items that are on his or her person, but so does precedent. *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556, 560 (1993) (explaining that a search of a person always involves a greater degree of intrusion upon the person's privacy interest than the search of a thing). Justice Brennan expressed similar reasoning in distinguishing the sniffing of inanimate objects by drug dogs from the sniffing of human beings for purposes of what constitutes a search under the Fourth Amendment. *See Doe v. Renfrow*, 451 U.S. 1022, 1026 n. 4, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from the denial of certiorari).

the U.S. Supreme Court's decision to lower the level of suspicion necessary for a search no longer exist. Thus, the lower standard of "reasonableness" should no longer be applied. *See Cass,* 709 A.2d at 370–371 (Zappala, J., dissenting).

In its decision justifying a lesser degree of suspicion, the U.S. Supreme Court balanced the child's privacy interest against "the substantial interest of the teachers and administrators in maintaining discipline in the classroom and on the school grounds." *Id.* at 340, 105 S.Ct. 733. The Court also relied upon school officials' need to foster a "proper educational environment" and a suggestion that it would be inappropriate to require a school official to obtain a warrant or have probable cause before being able to conduct a search of a student's belongings, given the "value of preserving the informality of the student teacher relationship." *Id.* The Court also reasoned that allowing school officials to conduct searches based upon mere reasonable suspicion "will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause." *T.L.O.,* at 343, 105 S.Ct. 733. Accordingly, a reasonableness standard, rather than a probable cause standard, was applied to searches in a school setting.

Once the police enter upon school grounds, however, the balance changes. School officials no longer have a problem maintaining an environment free of disruption, and the informal student-teacher relationship that the Court valued so much in *T.L.O.* clearly does not exist any longer. The police are waiting at the doors of the school to conduct a point-of-entry search when the children arrive. Moreover, it may be assumed that the police are already schooled in the niceties of probable cause. Thus, under the facts of this case, the bases upon which the U.S. Supreme Court lowered the amount of suspicion needed to justify a search in a public school do not exist. The entrance of the police onto school grounds to conduct searches destroys the *sui generis* "school setting" that has been characterized as unique for purposes of Fourth Amendment jurisprudence.

Justice Stevens, in his dissenting opinion in *T.L.O.,* which was joined by Justice Marshall, and, in pertinent part, Justice Brennan, discussed the destructive effect that allowing children to be treated in a manner that would be unconstitutional in any other environment than a school building would have on our students. In doing so, Justice Stevens quoted language used by Justice Brandeis in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (Brandeis, J., dissenting):

> Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

Justice Stevens went on to explain that "[s]chools are places where we inculcate the values essential to the meaningful exercise of rights and responsibilities by a self-governing citizenry. If the Nation's students can be convicted through the use of arbitrary methods destructive of personal liberty, they cannot help but feel that they have been dealt with unfairly." *T.L.O.,* at 373–374, 105 S.Ct. 733 (Stevens, J., dissenting, joined by Justices Marshall and Brennan) (footnotes omitted). It is clear to me that in the facts of this case these concerns are more relevant than ever before. The government has now taken a significant step in teaching University High students contempt for the law by subjecting them to arbitrary police conduct. *See Acton,* at 666, 115 S.Ct. 2386 (Ginsburg, J. concurring)(O'Connor, J. dissenting, joined by Justices Stevens and Souter).

Finally, Justice Stevens appropriately noted Justice Brennan's dissent from the denial of certiorari in another case, *Doe v. Renfrow,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981). In *Renfrow,* school officials and police detained every junior and senior high school student in a town and then used drug-sniffing dogs to conduct a student-by-student inspection to see if there was contraband present. One of the dogs repeatedly pushed its nose and muzzle into a thirteen year old student's legs. After she emptied her pockets, which revealed nothing illegal, the dog

continued to alert. The young lady was escorted to the school nurse's office and ordered to strip. She did so, and again nothing was found. As it turned out, the highly trained police dog had apparently alerted because the young girl had been playing with her own dog, which was in heat, on the morning of the raid. *Id.* at 1024 n. 1, 101 S.Ct. 3015. The girl sought injunctive relief and declaratory relief as well as compensatory and punitive damages, under 42 U.S.C. §§ 1983 and 1985(3), claiming a violation of her Fourth, Ninth, and Fourteenth Amendment rights provided by the federal constitution. Other than with respect to a grant of good-faith immunity regarding the strip search, the Seventh Circuit affirmed the district court's rejection of the girl's claims. In his dissent to the denial of certiorari, Justice Brennan made the following observation:

> We do not know what class petitioner was attending when the police and dogs burst in, but the lesson the school authorities taught her that day will undoubtedly make a greater impression than the one her teacher had hoped to convey. I would grant certiorari to teach petitioner another lesson: that the Fourth Amendment protects 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures'.... Schools cannot expect their students to learn the lessons of good citizenship when the school authorities themselves disregard the fundamental principles underpinning our constitutional freedoms.

*Id.* at 1027–1028, 101 S.Ct. 3015. Justice Brennan concluded that "[o]nce school authorities enlist the aid of police officers ....they step outside the bounds of any quasi-parental relationship, and their conduct must be judged according to the traditional probable-cause standard." *Id.*

Because the police officers had absolutely no basis for suspecting that F.B. possessed even a three-inch Swiss army knife, and thus lacked probable cause to believe that he was armed, it is clear to me that F.B.'s Fourth Amendment rights were violated at the hands of law enforcement officials. *See* Slip. Op. (Flaherty, C.J., concurring) (expressing concern over the characterization of a three-inch Swiss army knife as a weapon); *see also* T.L.O., at 382–383, 105 S.Ct. 733 (Stevens, J, dissenting, joined by Justice Marshall) (focusing on the character of the rule infraction that is to be the object of the search).

Although my conclusion that the federal constitution was violated makes it unnecessary for me to address the majority's analysis pursuant to the Pennsylvania Constitution, I feel compelled to note my disagreement with the majority's analysis under our state constitution.

The majority identifies the following four factors as relevant to an analysis of a school search's validity under the Pennsylvania Constitution: 1) a consideration of the students' privacy interest, 2) the nature of the intrusion created by the search, 3) notice, and 4) the overall purpose to be achieved by the search and immediate reasons prompting the decision to conduct the search. Majority Op. at 365. In its discussion of both the privacy interest of the students and the nature of the intrusion created by the search, the majority makes the following statements: "Although the search at issue is described as a search of the person, that would be a literal description of the search, not a common sense depiction of the actual process. The students do not suffer physical intrusion during the search. A hand-held metal scanner is passed over the students' outer clothing." Majority Op. at 365–66.

The majority's "common sense" depiction of the search that F.B. and his schoolmates were subjected to consists of nothing more than overlooking the fact that the students' pockets, bags, purses, and other personal items were taken from them and also searched. The majority disregards a literal description of the search in favor of a glossy mischaracterization of the police conduct. Likewise, the majority's assertion that "[t]he students do not suffer physical intrusion during the search" is simply untrue. Forcing school children to empty their pockets, hand over their bags, and be scanned, is clearly a physical intrusion similar to any other type of intrusion from which our constitution provides protection.

The majority also relies upon the use of electronic weapon scanners in other contexts in support of its conclusion that the intrusion at issue here is minimal. Majority Op. at 365–66. However, the use of such equipment in airports is distinguishable in that individuals can easily avoid those scanners by simply choosing to travel another way. In contrast, students are required by law to attend school, see 24 P.S. § 13–1327, and as a consequence the children of University High are compelled to submit to such scanning. Therefore, the analysis of the two issues is entirely distinct.

By placing undue weight on the degree of physical intrusion that occurs when an individual is subjected to a metal scanner, the majority downplays the individual's privacy interest, which is the touchstone of Article I, Section 8's protection. The majority blurs the two considerations by stating, "[a] determination of whether the increased privacy interest involved in a search of a student himself bars the type of search at issue here, necessitates a consideration of the second factor identified in our analytical framework: the nature of the intrusion created by the search. We note that this court has identified the framework for our analysis as involving four distinct factors, but the analytical process requires consideration of these factors in concert, not in isolation." Majority Opinion at 365. In considering these two factors "in concert" the majority focuses on the physically less intrusive nature of a scanner (again overlooking the search of the students' pockets, purses, and other personal items) rather than the object of the search which is being conducted. It is the students' privacy interest in their bodies that is placed at issue when they are scanned.

I also find the majority's application of the notice factor for assessing the search's validity to be somewhat disingenuous. The compulsory education law makes notice of the search almost meaningless for purposes of assessing the search's constitutional validity. Furthermore, as the majority recognizes, there is absolutely nothing in the record with respect to what notice of the searches the students at University High are given.

The final factor that the majority considers under its analysis of the state constitution is the "overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search." Majority Op. at 366. As the majority recognizes, the record is silent as to any immediate reasons that University High School decided to have the police conduct this point of entry weapons search on October 14, 1993. *Id.* at 366. Nonetheless, the majority claims that the overall purpose of the search was to keep weapons out of schools, and that such an interest is so obvious that the need to develop a record on that point is superfluous. *Id.* at 367.

While I share the majority's view on the importance of keeping weapons out of our schools, the absence in the record of any justification for the search on the day in question precludes me from finding that the overall purpose of the search outweighs the substantial intrusion upon the high expectation of privacy that the search implicates. Otherwise, suspicionless searches could be justified in almost any context by citing an interest in protecting public safety.

Thus, in addition to my finding that the federal constitution was violated, I likewise find that this Commonwealth's constitution was violated by the Philadelphia Police Department's search of F.B.[3]

For the above stated reasons, I respectfully dissent.

---

3. In the last paragraph of its opinion, the majority relies upon the fact that the search at issue was directed at all students as support for its finding that no constitutional violation occurred. However, as Justice O'Connor discussed in detail in her dissent in *Acton*, "[t]he view that mass, suspicionless searches, *however evenhanded*, are generally unreasonable remains inviolate in the criminal law enforcement context." *Acton*, at 671–672, 115 S.Ct. 2386 (O'Connor, J., dissenting), *citing*, *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (emphasis added).