

# In the Missouri Court of Appeals
## Eastern District
**DIVISION FIVE**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.E., | ) | No. ED107245 |
| | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court of the |
| | ) | City of St. Louis |
| | ) | Cause No. 1722JU-00529 |
| | ) | |
| | ) | Honorable Robin Ransom |
| | ) | |
| | ) | Filed: September 10, 2019 |

### OPINION

L.E. appeals the order and judgment of the Juvenile Division of the Circuit Court of the

City of St. Louis (the "juvenile court") finding that L.E. committed the offense of unlawful use

of a weapon when he brought a firearm into Soldan High School. In his sole point on appeal,

L.E. argues that the juvenile court clearly erred in overruling his motion to suppress evidence of

the firearm being found in a tissue box that was inside L.E.'s backpack because the search

conducted by the school's safety officers was unlawful in that it violated L.E.'s Fourth

Amendment rights.[1] Specifically, L.E. asserts that the suspicionless hand-search of his backpack

conducted by Saint Louis Public Schools' ("SLPS")[2] safety officers (which resulted in the

---

[1] The American Civil Liberties Union also filed an *amicus curiae* brief in support of L.E., largely asserting the same arguments that L.E. presented in his appellant's brief.

[2] Soldan High School is one of several schools governed by SLPS.

1

discovery of the firearm in L.E.'s backpack) violated his Fourth Amendment rights because the search was unreasonable under all of the circumstances. Finding that the search did not violate L.E.'s Fourth Amendment rights and that the juvenile court did not err in denying his motion to suppress evidence relating to the discovery of the firearm, we affirm the judgment of the juvenile court.

## I.　　Factual and Procedural Background

The following facts were adduced from the admitted evidence. On the morning of August 17, 2018, L.E. entered Soldan High School to attend classes. Students routinely enter the school through its back doors, whereupon entering, they are required to walk through a metal detector and have their bags hand-searched by either a school safety officer or a teacher. This procedure, which SLPS implements daily throughout its school system, is "for the safety of the students, the staff and the individuals in the building" and to ensure that nothing enters the school "that would harm anyone in the building." When L.E. entered the school on August 17, 2018, he complied with said procedure, placing his bag on the table to be searched and walking through the metal detector. School Safety Officer Harrison Carey ("Carey") searched L.E.'s bag by hand by removing most of the items inside, as was the protocol for all persons entering the school. Upon conducting his search, Carey discovered a tissue box inside L.E.'s bag that felt unusually heavy. Carey shook the tissue box and asked L.E. what was inside; L.E. responded "don't open that." Carey called over his fellow safety officer, School Safety Officer Ricardo Graham ("Graham"), to search the box. At that point, L.E. implored Carey not to open the box, and whispered to Carey that there was a loaded .380 caliber handgun inside. L.E. told Carey and Graham that he brought the gun to school in case there was "some kind of altercation" at the football game that night with individuals from a neighborhood near where L.E. lived. Without opening the tissue

2

box, Carey and Graham escorted L.E. to the school's security office, where they handcuffed L.E. Carey and Graham thereafter opened the tissue box and found the firearm (which was loaded with one round that was chambered), unloaded the gun, and called the police. When police officers arrived, they took L.E. into custody, and obtained the firearm, magazine, and bullet from Carey and Graham.

Prior to the gun being discovered in L.E.'s backpack, the juvenile court had placed L.E. on Intensive Official Court Supervision, but leaving him in the care, custody, and control of his mother, after the court found that L.E. had committed the offenses of first-degree robbery and attempted first-degree robbery in October of 2017. After the gun was found in L.E.'s backpack, a juvenile officer of the Division of Youth Services of the Missouri Department of Social Services filed an amended motion to modify the previous order and judgment of the juvenile court. In the amended motion to modify, the juvenile officer asserted that modification of the court's previous order was appropriate because L.E. had committed the offense of unlawful use of a weapon by bringing a loaded firearm into his school on August 17, 2018.[3] Thereafter, L.E. filed a motion to suppress evidence concerning the firearm at issue because it was found as a result of an unlawful search and seizure that violated L.E.'s Fourth Amendment rights; the parties subsequently submitted memoranda to the juvenile court on that issue, and the court heard argument on that issue during a hearing on the matter.

At the hearing, testimony was proffered by both Carey and Graham, in which they detailed the reasons for SLPS' search policy and the events of August 17, 2018, preceding L.E.'s arrest. Carey and Graham also testified that it was protocol to have the students (including L.E.) unzip every compartment of their bags, the officer or teacher searching would remove most, if

---

[3] As a condition of the juvenile court's supervision relating to L.E.'s offenses committed in October of 2017, L.E. was specifically ordered by the court to not possess a firearm.

3

not all items from the bags to ensure no dangerous items were inside, and said hand-searches of bags occur on a table next to the metal detectors through which students walk upon entering the school. Additionally, the firearm, magazine, and bullet were also presented as evidence. After all of the evidence had been presented and the juvenile court had heard argument on the motion to suppress, the court denied the motion, reasoning that the search procedure implemented by SLPS did not violate L.E.'s Fourth Amendment rights because the search was conducted for the safety of persons inside the building and for the purpose of preventing weapons from entering the school. The court thereafter entered its order and judgment finding that the juvenile officer had proven beyond a reasonable doubt that L.E. committed the offense of unlawful use of a weapon, and committed L.E. to the Division of Youth Services for appropriate placement.

This appeal follows.

## II.      Standard of Review

Ordinarily, "[w]hen reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling," and will reverse only if the ruling was clearly erroneous. *State v. Williams,* 521 S.W.3d 689, 693 (Mo. App. E.D. 2017) (quoting *State v. Pike,* 162 S.W.3d 464, 472 (Mo. banc 2005)); *see also State v. J.D.L.C.,* 293 S.W.3d 85, 87–88 (Mo. App. W.D. 2009). However, while we give deference to a trial court's factual findings and credibility determinations, we review questions of law (such as whether a constitutional right was violated) *de novo. Williams,* 521 S.W.3d at 693; *State v. Grayson,* 336 S.W.3d 138, 142 (Mo. banc 2011); *In Interest of J.L.H.,* 488 S.W.3d 689, 693 (Mo. App. W.D. 2016).

4

### III.    Discussion

In his sole point on appeal, L.E. argues that the juvenile court clearly erred in denying his motion to suppress evidence of the firearm found in his backpack because the search conducted upon his backpack was unlawful. Specifically, L.E. contends that the suspicionless hand-search of his backpack violated his Fourth Amendment rights in that: the search that yielded the firearm found in L.E.'s bag was not based upon individualized reasonable suspicion that L.E. was involved in any illicit activity; it unreasonably infringed upon L.E.'s legitimate expectation of privacy in his bag; the intrusiveness of the search was severe; and the nature and immediacy of the school's interest in conducting the search was no more than a generalized concern for safety without a showing of a need sufficient to justify the substantial intrusion upon L.E.'s privacy interest.

The Fourth Amendment to the Constitution of the United States provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "The Fourth Amendment, by virtue of the Fourteenth Amendment, applies to searches by public-school officials, as they are considered state actors." *Williams,* 521 S.W.3d at 694 (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 334 (1985)); *see also Doe ex rel. Doe v. Little Rock Sch. Dist.,* 380 F.3d 349, 351–52 (8th Cir. 2004).

"'Reasonableness' is 'the touchstone of the constitutionality of a governmental search,' and the relevant constitutional question in school search cases is 'whether the search was reasonable in all the circumstances.'" *Doe,* 380 F.3d at 352 (quoting *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls,* 536 U.S. 822, 828 (2002) and *Thompson v. Carthage Sch. Dist.,* 87 F.3d 979, 982 (8th Cir. 1996)) (internal citations omitted). Unlike

5

search-and-seizure cases in other contexts, the "reasonableness" inquiry in regards to the Fourth Amendment in public schools must include the consideration of "the school's tutelary responsibility for children" and that "securing order in a public-school environment sometimes requires greater controls over students than those over adults." *Williams,* 521 S.W.3d at 694 (citing *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 656 (1995) ("*Vernonia*") and *Earls,* 536 U.S. at 831). For that reason, the Supreme Court of the United States has maintained that public schools fall under a "special needs" category that exempt them from warrant and probable-cause requirements typically associated with searches conducted by state actors. *Vernonia,* 515 U.S. at 653.

The Supreme Court of the United States has established two related, yet distinct standards to determine whether a public school search is reasonable (and therefore constitutional): one for searches based upon individualized suspicion (established by *New Jersey v. T.L.O.,* 469 U.S. 325 (1985)) and one for suspicionless searches (as iterated in *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646 (1995) and *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls,* 536 U.S. 822 (2002)). *Williams,* 521 S.W.3d at 694–95. In determining whether a public school search is reasonable under either standard, courts must engage in a fact-specific balancing inquiry in which they weigh the intrusion on the individual's Fourth Amendment privacy interests against the promotion of legitimate government interests. *T.L.O.,* 469 U.S. at 337; *Vernonia,* 515 U.S. at 652–53; *Earls,* 536 U.S. at 829.

In *T.L.O.*, the Court developed a two-fold inquiry to evaluate whether a public school search based upon individualized suspicion was reasonable: (1) whether the search was justified at its inception; and (2) "whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.,* 469 U.S. at

341. Subsequently, consistent with its holding in *T.L.O.,* the Court determined in *Vernonia* and *Earls* that, even absent individualized suspicion, public school searches could be found to be reasonable if they passed muster under a broad balancing test. *Vernonia,* 515 U.S. at 654–65 (holding that urinalysis drug testing of student-athletes did not violate their Fourth Amendment rights); *Earls,* 536 U.S. at 830–38 (holding that urinalysis drug testing of students participating in non-athletic extracurricular activities did not violate their Fourth Amendment rights). The standard enunciated by the Court in *Vernonia* and *Earls* requires the weighing and balancing of three factors: (1) "the nature of the privacy interest allegedly compromised," (2) "the character of the intrusion imposed," and (3) "the nature and immediacy of the government's concerns and the efficacy of the [p]olicy in meeting them." *Earls,* 536 U.S. at 830–38; *see also Vernonia,* 515 U.S. at 654–65.

In the case at bar, there was no individualized suspicion that led Carey and Graham to search L.E.'s backpack. Rather, the search of L.E.'s backpack, consistent with SLPS' policy of hand-searching the bags of persons entering the school, qualifies as a suspicionless search. Therefore, we must apply the standard set out in *Vernonia* and *Earls* to the search conducted in this case to determine if it was reasonable, and therefore, constitutional, or if the search violated L.E.'s Fourth Amendment rights. We find only one Missouri case, *State v. Williams,* 521 S.W.3d 689 (Mo. App. E.D. 2017) (holding that the hand-search of a student's person because he was tardy for school (which resulted in the discovery of drugs in the student's pocket) violated the student's Fourth Amendment rights), that applies the *Vernonia*/*Earls* standard. As such, we apply *Williams*'s holding and reasoning to the extent that the facts of that case are analogous to those of this case, but also rely upon Supreme Court precedent and cases with more analogous

fact patterns from federal circuits and the courts of other states to guide our weighing and balancing of the *Vernonia*/*Earls* factors.

 1. <u>The Nature of the Privacy Interest Allegedly Compromised</u>

 "A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." *Earls,* 536 U.S. at 830. "Students in public schools do indeed have lesser expectations of privacy than people generally have in public situations, due in large part to the government's responsibilities 'as guardian and tutor of children entrusted to its care.'" *Doe,* 380 F.3d at 353 (quoting *Vernonia,* 515 U.S. at 665). However, while the privacy interests of public school students are lessened, they are not non-existent; because "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view, … public school students thus retain a protection against 'unreasonable' searches of their backpacks and purses by school officials." *Id.* As the Supreme Court recognized in *T.L.O.*:

> Students at a minimum must bring to school not only the supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming. In addition, students may carry on their persons or in purses or wallets such nondisruptive yet highly personal items as photographs, letters, and diaries. Finally, students may have perfectly legitimate reasons to carry with them articles of property needed in connection with extracurricular or recreational activities. In short, schoolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.

*T.L.O.,* 469 U.S. at 339.

 In this case, L.E.'s privacy interest is that of just a public school student—as opposed to that of a public school student participating in extracurricular activities, whose Fourth Amendment privacy interests are even more reduced. *See Vernonia*, 515 U.S. at 657 (finding that "students who voluntarily participate in school athletics have reason to expect intrusions upon

8

normal rights and privileges, including privacy"); *Earls*, 536 U.S. at 831–32 (noting that students who engage in non-athletic extracurricular activities similarly "subject themselves to many of the same intrusions on their privacy as do athletes"); *Williams*, 521 S.W.3d at 705. As such, L.E. had a legitimate privacy interest in regards to the contents of his backpack, although a lesser one than that of people generally in public situations. *See Vernonia,* 515 U.S. at 656–57; *Doe,* 380 F.3d at 353 ("[P]ublic school students have traditionally been treated as presumptively responsible persons entitled to some modicum of privacy in their personal belongings, at least to the extent that recognition of such privacy interests does not unduly burden the maintenance of security and order in schools."); *Williams*, 521 S.W.3d at 705.

    2. <u>The Character of the Intrusion Imposed</u>

"A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *T.L.O.,* 469 U.S. at 337–38. Additionally, the extent to and conditions under which a search was conducted are certainly relevant aspects in determining just how intrusive the search was. *Williams*, 521 S.W.3d at 705 (noting that school officials physically touching the student by conducting a "pat-down" "exacerbate[d] the intrusive nature of the search" that resulted in illegal drugs being found on the student's person); *Doe,* 380 F.3d at 355 (reasoning that the students' privacy interests "in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here, because all such belongings are subject to being searched at any time without notice, individualized suspicion, or any apparent limit to the extensiveness of the search"); *Vernonia*, 515 U.S. at 658 (concluding that requiring public school student-athletes to submit urine samples under the same privacy conditions that one would experience in a public bathroom was only a negligible invasion of privacy); *Earls,*

536 U.S. at 832–33 (noting that the urine sample collection process at issue was virtually identical to that in *Vernonia,* and that such a collection process was a negligible intrusion on the students' privacy).

In this case, students, such as L.E., were required to place their bags on a table upon entering the school to be hand-searched by either a school safety officer or a teacher. From the testimony given by Carey and Graham before the juvenile court, it appears that every compartment of the bag being searched is unzipped, the officer or teacher searching removes all or most of the items from the bag, and said search is conducted in plain view of all surrounding persons. The circumstances of this search are somewhat akin to the search process at issue in *Doe*, where school officials would randomly choose a classroom, and require every student in that chosen classroom to place their bags and everything in their pockets on their desks to be searched by school officials while the students waited outside the classroom. *Doe*, 380 F.3d at 351, 355 (finding that the search procedure at issue was "highly intrusive"). We find that the search in this case significantly intruded upon L.E.'s privacy because, although public school students' privacy interests are less than those of adults in a public setting, L.E. still had a legitimate expectation of privacy in his backpack.

Although L.E. argues (citing *Doe,* 380 F.3d at 355) that less-intrusive means of searching students' bags exist, we are unpersuaded that the hand-search of L.E.'s bag is necessarily unreasonable simply because there may be less-invasive methods of searching. Whether there are less-intrusive means of searching is not part of the standard established by *Vernonia* and *Earls*; rather, we are to examine "the character of the intrusion imposed"—not potential alternatives— as one of three factors in the balancing analysis. *See Vernonia*, 515 U.S. at 654–65; *Earls*, 536 U.S. at 830–38. The Supreme Court emphasized this in *Earls*, stating "this Court has repeatedly

10

stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" *Earls*, 536 U.S. at 837 (quoting *U.S. v. Martinez-Fuerte,* 428 U.S. 543, 556–57, n. 12 (1976)); *see also Vernonia,* 515 U.S. at 663 ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."). Thus, while less-invasive means of searching may exist, we do not give this consideration when determining the character of the intrusion imposed in this case.

Another aspect of this factor is also the purpose for which the fruits of the public school search at issue are used. *Vernonia,* 515 U.S. at 658; *Earls,* 536 U.S. at 833; *Doe*, 380 F.3d at 355. When results of a public school search are used to criminally prosecute students instead of promoting students' safety and welfare, the character of the intrusion is more severe. *Doe*, 380 F.3d at 355 ("Rather than acting *in loco parentis*, with the goal of promoting the students' welfare, the government officials conducting the searches are in large part playing a law enforcement role with the goal of ferreting out crime and collecting evidence to be used in prosecuting students."); *Williams,* 521 S.W.3d at 705 ("Rather than a search conducted to promote students' welfare and safety, the policy here operated, in large part, with a law-enforcement purpose. As a result, the intrusiveness of the search under a constitutional analysis is very, very high.") (citations omitted).

Here, the results of the search of L.E.'s backpack were immediately turned over to the police, and resulted in L.E. being placed in the care, custody, and control of the Division of Youth Services. In regards to how the results of the search were used in this case, we find that the character of the intrusion is qualitatively severe because the fruits of the search were used for

law enforcement purposes instead of solely promoting the safety and welfare of the students. *See Doe*, 380 F.3d at 355; *Williams,* 521 S.W.3d at 705.

 3. <u>The Nature and Immediacy of the Government Interest and the Efficacy of the Means for Meeting that Interest</u>

"A sliding scale is used in evaluating the reasonableness of a search, that is, the government is entitled to inflict more serious intrusions upon legitimate expectations of privacy as the governmental interest served by the intrusions becomes more compelling." *Doe,* 380 F.3d at 355. "A governmental interest need not meet some 'fixed, minimum quantum of governmental concern,' but merely has to be '*important enough* to justify the particular search at hand,' considering the degree of its intrusiveness." *Id.* (quoting *Vernonia,* 515 U.S. at 661) (emphasis in original).

In this case, both Carey and Graham testified that the stated purpose of the SLPS search policy was "safety"; as such, we consider that to be the governmental interest in conducting the search of L.E.'s backpack. Undoubtedly, safety in all public schools (especially in regards to weapons such as firearms and knives) is not only a legitimate government interest, but is a compelling one that needs little verification by this point. *See Boim v. Fulton Cnty. Sch. Dist.,* 494 F.3d 978, 984 (11th Cir. 2007) (noting the "climate of increasing school violence and government oversight," and that schools have an "[i]ndisputably compelling interest in acting quickly to prevent violence on school property"); *Milligan v. City of Slidell,* 226 F.3d 652, 655 (5th Cir. 2000) ("In this case, the school sought to protect its students, to foster self-discipline and to deter possibly violent misconduct. These are compelling governmental interests."); *Stockton v. City of Freeport, Tex.,* 147 F.Supp.2d 642, 646 (S.D. Tex. 2001) ("It is difficult to conceive of a scenario in which a greater governmental interest is invoked than the threat of indiscriminate violence at school."); *In re F.B.,* 555 Pa. 661, 672–73 (Pa. 1999) ("Simply stated,

12

guns, knives, or other weapons, have no place in the public school setting. Thus, a record is not necessary in order for this court to recognize the compelling concern for the protection of the students at issue."); *State v. J.A.,* 679 So.2d 316, 320 (Fla. Dist. Ct. App. 1996) ("Judges cannot ignore what everybody else knows: violence and the threat of violence are present in the public schools.... Schoolchildren are harming each other with regularity."). The stated governmental interest of safety in public schools (specifically, in regards to weapons) is indeed a compelling concern of the government in operating public schools.

In regards to the immediacy of the interest of safety in public schools, we find that there is certainly an immediate need in this case to prevent weapons from being brought into schools in order to protect the safety and welfare of students, teachers, staff, and guests. L.E. asserts that the immediacy of the stated interest of safety was insufficiently demonstrated here because "there is nothing in the record regarding the magnitude of any problems with weapons or drugs that Soldan [High School] had actually experienced." We reject L.E.'s argument out of hand because, hypothetically under that premise, SLPS would have to wait until weapons (and likely injuries and/or deaths) became systemically problematic before it could implement security measures to prevent weapons from being brought into schools. Not only do we find such an assertion unpersuasive (especially in the context of weapons like that found in L.E.'s backpack), but the suggestion that there must be evidence of a specific problem in order for the government to sufficiently claim immediacy of an interest in preventing or addressing something is inconsistent with Supreme Court precedent. *See Vernonia,* 515 U.S. at 663 (noting that the Court had upheld suspicionless drug testing where there was no documented history of drug use); *Earls,* 536 U.S. at 835–36 ("[I]t would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug

13

testing program designed to deter drug use."). The courts of other states have also reasoned similarly in regards to public school searches for weapons. *See In re F.B.,* 555 Pa. at 673 ("The [s]chools are simply not required to wait for a tragedy to occur within their walls to demonstrate that the need is immediate."); *J.A.,* 679 So.2d at 320. With weapons (particularly, firearms) being notoriously problematic for all schools because they pose a constant and grave threat to the safety and wellbeing of every student, teacher, staff member, and guest, it is not hyperbole to say that the interest of safety in public schools in regards to weapons is of the utmost immediacy.

Finally, we find that SLPS' method of hand-searching bags of all persons entering the school is a reasonably effective means of addressing the compelling government interest of safety. Again, while this search method may not be the least-intrusive means, it is certainly effective in completing the objective of preventing weapons from entering schools, as demonstrated by the fact that the firearm hidden inside a tissue box in L.E.'s backpack was discovered as a result of such a hand-search. As indicated by Carey and Graham's testimony, bags entering the school are thoroughly searched and the items inside are carefully inspected (such as the tissue box inside L.E.'s backpack containing the firearm). Additionally, the fact that this hand-search policy is known to be enforced throughout SLPS' system logically acts as a deterrent to persons entering the school with weapons. Thus, SLPS' method of hand-searching each bag entering the school in this case is an effective means of addressing the interest of personal safety by keeping weapons out of the school.

### IV.      Conclusion

After weighing the nature of the privacy interest allegedly compromised, the character of the intrusion imposed, and the nature and immediacy of the government's concerns and the efficacy of the search method in meeting them, we conclude that the search of L.E.'s backpack

14

was reasonable and that L.E.'s Fourth Amendment rights were not violated. The hand-search of L.E.'s backpack was considerably invasive because of the intrusive character of the search and because the results were turned over to law enforcement. However, L.E. had a lessened privacy interest as a public school student, SLPS' interest of safety is extremely compelling (especially in regards to weapons like that found in L.E.'s backpack), the concern of safety in public schools being threatened by weapons is immediate, and SLPS' method of searching is quite effective. Undoubtedly, public school students are entitled to rights against unreasonable searches; however, in the circumstances of this case, the search of L.E.'s backpack was reasonable given his lessened expectation of privacy in the public school setting and the nature and immediacy of the governmental interest of ensuring safety in public schools. *See Vernonia,* 515 U.S. at 661, 664–65; *Earls,* 536 U.S. at 834-36, 838; *Doe,* 380 F.3d at 355–56.

Therefore, we find that the juvenile court did not err in denying L.E.'s motion to suppress evidence of the firearm found in his backpack, and the judgment of the juvenile court is affirmed.

_____
Colleen Dolan, Chief Judge

Sherri B. Sullivan, J., concurs.
Robert M. Clayton III, J., concurs.

15