MORRIS SHEPPARD ARNOLD, Circuit Judge.
This case requires us to decide whether the practice of the Little Rock School District (LRSD) that subjects secondary public school students to random, suspicionless searches of their persons and belongings by school officials is unconstitutional. We conclude that such searches' violate the students’ fourth amendment rights because they unreasonably invade their legitimate expectations of privacy.
Jane Doe is a secondary school student in the LRSD. One day during the school year, all of the students in Ms. Doe’s classroom were ordered to leave the room after removing everything from their pockets and placing all of their belongings, including their báckpacks and purses, on the desks in front of them. While the students were in the hall outside their classroom, school personnel searched the items that the students had left behind, including Ms. Doe’s purse, and they discovered marijuana in a container in her purse. The parties have stipulated that LRSD has a practice of regularly conducting searches of randomly selected classrooms in this manner.
In her amended complaint, Ms. Doe, individually and on behalf of a class of “all secondary public school students who have started seventh grade in the [LRSD] as of the 1999-2000 school year,” claimed that this method of conducting searches is unconstitutional, and sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. After certifying the case as a class action, the district court entered judgment for the LRSD and dismissed the complaint with prejudice. We reverse.
I.
The fourth amendment provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall, not be violated.” U.S. Const. amend. IV. The fourteenth amend *352 ment extends this constitutional guarantee to searches by state officers, including public school officials. See New Jersey v. T.L.O., 469 U.S. 325, 334-37, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). “In carrying out searches ... school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents’ immunity from the strictures of the Fourth Amendment.” Id. at 336-37, 105 S.Ct. 733. “Reasonableness” is “the touchstone of the constitutionality of a governmental search,” Board of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 828, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), and the relevant constitutional question in school search cases is “whether the search was reasonable in all the circumstances,” Thompson v. Carthage Sch. Dist., 87 F.3d 979, 982 (8th Cir.1996).
In determining whether a particular type of school search is constitutionally reasonable, we engage in a fact-specific “balancing” inquiry, under which the magnitude of the government’s need to conduct the search at issue is weighed against the nature of the invasion that the search entails. “On one side of the balance are arrayed the individual’s legitimate expectations of privacy and personal security; on the other, the government’s need for effective methods to deal with breaches of public order.” T.L.O., 469 U.S. at 337, 105 S.Ct. 733.
The Supreme Court has developed a framework designed to make the required balancing of privacy and security interests somewhat less amorphous than it might otherwise be. A reviewing court is to consider first the “scope of the legitimate expectation of privacy at issue,” then the “character of the intrusion that is complained of,” and finally the “nature and immediacy of the governmental concern at issue” and the efficacy of the means employed for dealing with it. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654-66, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). The district court addressed each of these considerations in turn, and decided that they all supported the conclusion that the search practice involved in this case was reasonable. In particular, the district court stated in its order that LRSD students have only a “limited privacy interest,” and that the search practice is “minimally intrusive, is preceded by adequate notice, is motivated by a significant policy concern, and is directed towards an immediate, legitimate need.” Given these determinations, the district court held that “the search policy” was constitutional because it “reasonably serves the school district’s important interest in detecting and preventing drug use among its students.” In reaching this conclusion, the district court relied heavily on two recent cases in which the Supreme Court upheld school district policies that allowed only those students who agree to be subject to random drug testing to participate in school athletics or other competitive extracurricular activities. See Vernonia, 515 U.S. at 648, 664-65, 115 S.Ct. 2386; Earls, 536 U.S. at 825, 122 S.Ct. 2559.
After reviewing the reasonableness issue de novo, we conclude that the district court underestimated the extent to which the LRSD’s search practice intrudes upon its students’ legitimate privacy interests, and overestimated the substantiality of the LRSD’s factual showing that such an intrusion was necessary to address a significant difficulty in the schools. Students presumptively have a legitimate, though limited, expectation of privacy in the personal belongings that they bring into public schools. Because subjecting students to full-scale, suspicionless searches eliminates virtually all of their privacy in their belongings, and there is no *353 evidence in the record of special circumstances that would justify so considerable an intrusion, we hold that the search practice is unconstitutional.
II.
We ask first whether secondary public school students in the LRSD retain any legitimate expectations of privacy. The district court, quoting Earls, 586 U.S. at 830, 122 S.Ct. 2559, noted that a “ ‘student’s privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety.’ ” Students in public schools do indeed have lesser expectations of privacy than people generally have in public situations, due in large part to the government’s responsibilities “as guardian and tutor of children entrusted to its care.” Vemonia, 515 U.S. at 665, 115 S.Ct. 2386 (footnote omitted). Public school students’ privacy interests, however, are not nonexistent. We think it is clear that schoolchildren are entitled to expect some degree of privacy in the personal items that they bring to school.
As a general matter, “the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view,” United States v. Ross, 456 U.S. 798, 822-23, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), and public school students thus retain a protection against “unreasonable” searches of their backpacks and purses by school officials. Schoolchildren have a legitimate need to bring items of personal property into their schools, which are their “homes away from home” where they are required by compulsory attendance laws to spend a substantial portion of their waking hours. They “at a minimum must bring to school not only the . supplies needed for their studies, but also keys, money, and the necessaries of personal hygiene and grooming,” and they may also carry with them “such non-disruptive yet highly personal items as photographs, letters, and diaries.” T.L.O., 469 U.S. at 339, 105 S.Ct. 733. Unlike prisoners, who “retain no legitimate expectations of privacy in their cells” after having been convicted and incarcerated, see id. at 338, 105 S.Ct. 733, public school students have traditionally been treated as presumptively responsible persons entitled to some modicum of privacy in their personal belongings, at least to the extent that recognition of such privacy interests does not unduly burden the maintenance of security and order in schools.
The Supreme Court has observed that there is a tension between the types of privacy “interests protected by the Fourth Amendment and the interest of the States in providing a safe environment conducive to education in the public schools,” id. at 332 n. 2, 105 S.Ct. 733, and has concluded that the fourth amendment allows school officials some flexibility in resolving this tension. But it has characterized as “severely flawed” a state’s argument that “because of the pervasive supervision to which children in the schools are necessarily subject, a child has virtually no legitimate expectation of privacy in articles of personal property ‘unnecessarily’ carried into a school.” Id. at 338, 105 S.Ct. 733. While the Court has acknowledged that students’ privacy rights are limited due to the “difficulty of maintaining discipline in the public schools,” and that “drug use and violent crime in the schools have become major social problems,” it has stated that “the situation is not so dire that students in the schools may claim no legitimate expectations of privacy.” Id. at 338-39, 105 S.Ct. 733.
It is true that the legitimate expectation of privacy retained by members of certain sub-populations of a public school’s student body falls below the already limited base *354 line level of privacy afforded to public school students generally. For instance, the Supreme Court has analogized students who voluntarily participate in school athletics or other competitive extracurricular activities to adults who choose to participate in a “closely regulated industry,” in that both groups voluntarily subject themselves to “intrusions upon normal rights and privileges, including privacy.” Vernonia, 515 U.S. at 656-57, 115 S.Ct. 2386 (internal quotations omitted); Earls, 536 U.S. at 831-32, 122 S.Ct. 2559. Sports and other competitive extracurricular activities usually have separate systems of rules that do not apply to the student body as a whole, and often involve such requirements as mandatory physicals, frequent communal undress, and traveling and lodging in close confines. By consciously choosing to “go out for the team” or other competitive extracurricular endeavor, such students agree to waive certain privacy expectations that they would otherwise have as students in exchange for the privilege of participating in the activity. But the search regime at issue here is imposed upon the entire student body, so the LRSD cannot reasonably claim that those subject to search have made a voluntary tradeoff of some of their privacy interests in exchange for a benefit or privilege.
As the district court noted, a passage that was added to the LRSD’s current Secondary Student Rights and Responsibilities Handbook, which is distributed to students at the beginning of the school year, provides that “[bjook bags, backpacks, purses and similar containers are permitted on school property as a convenience for students,” and that “[i]f brought onto school property, such containers and their contents are at all times subject to random and periodic inspections by school officials.” But we do not think that this handbook passage has effected a waiver by LRSD students of any expectations of privacy that they would otherwise have. The students are required by state law to attend school, and have not entered into a contract that incorporates the handbook or voluntarily assented to be bound by its terms. The lack of mutual consent to the student handbook makes it fundamentally different from an employee handbook, which may create an enforceable contract between an employer and employee under traditional contract principles. The LRSD may not deprive its students of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored.
III.
Given that public school students retain some legitimate expectation of privacy in their persons and belongings, we are bound to inquire into the character of the intrusion that the LRSD’s search practice imposes. We respectfully disagree with the district court’s determination that the search practices of the LRSD are “minimally intrusive.”
Unlike the suspicionless searches of participants in school sports and other competitive extracurricular activities that the Supreme Court approved in Vemonia and Earls, in which “the privacy interests compromised by the process” of the searches were deemed “negligible,” Vernonia, 515 U.S. at 658, 115 S.Ct. 2386, see Earls, 536 U.S. at 832-33, 122 S.Ct. 2559, the type of search at issue here invades students’ privacy interests in a major way. “A search of a child’s person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.” T.L.O., 469 U.S. at 337-38, 105 S.Ct. 733 (footnote omitted). Students often carry items of a personal or private nature in *355 their pockets and bags, and many students (whether or not they are carrying contraband) must surely feel uncomfortable or embarrassed when officials decide to rifle through their personal belongings.
Whatever privacy interests the LRSD students have in the personal belongings that they bring to school are wholly obliterated by the search practice at issue here, because all such belongings are subject to being searched at any time without notice, individualized suspicion, or any apparent limit to the extensiveness of the search. Full-scale searches that involve people rummaging through personal belongings concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs. Indeed, dogs and magnetometers are often employed in conducting constitutionally reasonable large-scale “administrative” searches precisely because they are minimally intrusive, and provide an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches. The type of search that the LRSD has decided to employ, in contrast, is highly intrusive, and we are not aware of any cases indicating that such searches in schools pass constitutional muster absent individualized suspicion, consent or waiver of privacy interests by those searched, or extenuating circumstances that pose a grave security threat.
Another relevant consideration is the purpose for which the fruits of the searches at issue are used. In Vemonia and Earls, which involved drug testing of voluntary participants in competitive extracurricular activities, the results of the searches at issue were never disclosed to law enforcement authorities, and the most serious form of discipline that could possibly result from failing the tests was exclusion from the relevant extracurricular activities. See Earls, 536 U.S. at 833, 122 S.Ct. 2559; Vernonia, 515 U.S. at 651, 115 S.Ct. 2386. The Court in Earls, 536 U.S. at 834, 122 S.Ct. 2559, found that “the limited uses to which the test results are put” contributed significantly to a conclusion that the invasion of the students’ privacy was insignificant. In sharp contrast to these cases, the fruits of the searches at issue here are apparently regularly turned over to law enforcement officials and are used in criminal proceedings against students whose contraband is discovered. In fact, Ms. Doe was convicted of a misdemeanor as a result of the search of her purse. Because the LRSD’s searches can lead directly to the imposition of punitive criminal sanctions, the character of the intrusions is qualitatively more severe than that in Vemonia and Earls. Rather than acting in loco parentis, with the goal of promoting the students’ welfare, the government officials conducting the searches are in large part playing a law enforcement role with the goal of ferreting out crime and collecting evidence to be used in prosecuting students.
IV.
We consider finally the nature and immediacy of the governmental concerns that gave rise to the searches at issue here. A sliding scale is used in evaluating the reasonableness of a search, that is, the government is entitled to inflict more serious intrusions upon legitimate expectations of privacy as the governmental interest served by the intrusions becomes more compelling. A governmental interest need not meet some “fixed, minimum quantum of governmental concern,” but merely has to be “important enough to justify the particular search at hand,” considering the degree of its intrusiveness. Vernonia, 515 U.S. at 661, 115 S.Ct. 2386. The district court determined that the LRSD’s search practice is “directed to *356 wards an immediate, legitimate need.” It failed, however, to point to any evidence indicating that the LRSD has experienced any significant and immediate difficulties sufficient to give rise to a special need for such an unprecedented practice.
We conclude that the LRSD has in fact failed to demonstrate the existence of a need sufficient to justify the substantial intrusions upon the students’ privacy interests that the search practice entails. While the LRSD has expressed some generalized concerns about the existence of weapons and drugs in its schools, it conceded at oral argument that there is nothing in the record regarding the magnitude of any problems with weapons or drugs that it has actually experienced. All schools surely have an interest in minimizing the harm that the existence of weapons and controlled substances might visit upon a student population, but public schools have never been entitled to conduct random, full-scale searches of students’ personal belongings because of a mere apprehension.
In both Vernonia and Earls, the principal cases relied on by the LRSD, the school districts offered particularized evidence to “shore up” their assertions of a special need to institute administrative search programs for extracurricular-activity participants. See Earls, 536 U.S. at 835, 122 S.Ct. 2559. In Vemonia, the record demonstrated that “a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion,” “disciplinary actions had reached ‘epidemic proportions,’ ” and “the rebellion was being fueled by alcohol and drug abuse.” Vernonia, 515 U.S. at 662-63, 115 S.Ct. 2386. The Court emphasized, moreover, that the school district had particularly compelling safety concerns because its “athletes were the leaders of the drug culture” and “drug use increases the risk of sports-related injury.” Id. at 649, 115 S.Ct. 2386. Similarly, in Earls, the school district had “presented specific evidence of drug use” at its schools, leading to the district court’s finding that the school district was “faced with a ‘drug problem’ when it adopted the policy.” Earls, 536 U.S. at 834-35, 122 S.Ct. 2559.
We have upheld a blanket school search somewhat like the one at issue here when school officials had received specific information giving them reasonable grounds to believe that the students’ safety was in jeopardy. In Thompson, 87 F.3d at 980, 982-83, we determined that a single “generalized but minimally intrusive search” of all male students in the sixth through twelfth grades for knives and guns was “constitutionally reasonable” because “fresh cuts” on the seats of a school bus and student reports that there was a gun at the school that morning provided particularized evidence that there were dangerous weapons present on school grounds. In Thompson, as in Earls and Vemonia, random, suspicionless searches by school officials were deemed reasonable only after a specific showing was made that not engaging in the searches would have jeopardized some important governmental interest. No such showing has been made here.
V.
While the line separating reasonable and unreasonable school searches is sometimes indistinct, we think it plain enough that the LRSD’s search practice crosses it. In light of the government’s legitimate interest in maintaining discipline and safety in the public schools, the privacy that students in those schools are reasonably entitled to expect is limited. The LRSD’s search practice, however, effectively reduces these expectations to nothing, and the record contains no evi *357 dence of unique circumstances that would justify significant intrusions. The mere assertion that there are substantial prob--lems associated with drugs and weapons in its schools does not give the LRSD carte blanche to inflict highly intrusive, random searches upon its general student body. We therefore reverse the judgment of the district court, and we remand for entry of a judgment not inconsistent with this opinion.