# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1363

_____

Jodie Smook, individually and on         *
behalf of all other persons similarly    *
situated,                                    *
                                          *
           Appellee,             *
                                          *    Appeal from the United States
      v.                              *    District Court for the
                                          *    District of South Dakota.
Minnehaha County, South Dakota; Jim   *
Banbury, in his individual capacity;    *
Todd Cheever, as Director of         *
Minnehaha County Juvenile Detention   *
Center,                                 *
                                          *
           Appellants.          *

_____

Submitted: December 14, 2005
Filed: August 9, 2006

_____

Before MELLOY, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Jodie Smook filed this action pursuant to 42 U.S.C. § 1983, "individually and behalf of all other persons similarly situated," alleging, among other things, that the policy of the Minnehaha, South Dakota, County Juvenile Detention Center ("JDC") to "strip search[] minors without probable cause" was unconstitutional. The

complaint sought damages and injunctive relief. After granting Smook's motion for class certification, the district court denied the defendants' motions for summary judgment on the search claims, and granted the plaintiffs' motion for partial summary judgment on those claims. Defendants Jim Banbury and Todd Cheever, directors of the JDC, appeal the district court's denial of qualified immunity, and Minnehaha County also appeals the court's denial of its motion for summary judgment. We reverse and remand.

I.

Smook's complaint alleged that on August 8, 1999, when she was 16 years old, she and three minor friends were arrested by the Sioux Falls City Police Department after 11:00 p.m. for violating local curfew laws. All four juveniles were transported to the JDC. Smook alleged that as part of the admission process at the detention center, she and each of her friends were taken into a bathroom and "strip searched" by JDC personnel. (Complaint, R. Doc. No. 1, at 3-4). In her complaint, Smook asserted that the institution's search policy or practice was a violation of her right against unreasonable search and seizure under the Fourth and Fourteenth Amendments.

The district court certified two classes of plaintiffs who:

> when they [were] under the age of eighteen years, were charged with minor offenses from November 1, 1997 to a date to be set by the Court or were charged with non-felony offenses from April 16, 1999 to a date to be set by the Court, and were, pursuant to JDC policy, strip searched at the Minnehaha County Juvenile Detention Center.

(R. Doc. Nos. 42, 78). One class was defined as individuals in this category seeking injunctive relief; the other encompassed individuals seeking compensatory and punitive damages. The court further defined "minor offenses" to include petty theft,

-2-

liquor violations, being a runaway, and curfew violations, and defined "non-felony offenses" to include a litany of other specific non-violent offenses, such as truancy, tobacco, contempt of court, disturbance of school, and damage to public and private property.[1]

According to the written admission policy in effect at the time of Smook's arrest in 1999, when juveniles arrived at the JDC for admission, staff members were to take them to an intake area, to ask them to remove their personal items, and then to conduct an interview while an admission form was filled out. A photograph was to be taken, and the juvenile was to be given a wristband identification bracelet. The policy then called for the juvenile to take a shower, during which time a detention officer was to conduct a visual inspection of the person's body and a manual search of the person's clothes, including pockets and linings. The policy dictated that searches should "only be conducted by members of the same sex" and that "[t]he juvenile is not touched throughout this procedure." (Appellees' App. at 60).

It is undisputed, however, that when Smook was admitted to the JDC, she was not required to take a shower or to disrobe completely. Rather, she was required to remove her outer clothing so that it could be searched, but she remained clothed in her undergarments in a private room with a female staff member. One female JDC official testified that she did not recall ever asking a juvenile to remove her undergarments, because "you can pretty much see what's there when they're in undergarments." (Appellants' App. at 4). Banbury testified to his belief that some

---

[1]Smook's complaint also alleged that she was asked questions about her religious beliefs and practices and "ordered to answer those questions." (Complaint, R. Doc. No. 1, at 4). She alleged that these questions invaded her privacy and impinged upon her rights to free exercise of religion and freedom of association under the First and Fourteenth Amendments. The district court certified two other classes of plaintiffs in connection with these claims, but the claims were later dismissed, and they are not at issue on this appeal.

staff were performing searches as described in the written policy, while others were not. (Appellees' App. at 152).

In September 1999, the JDC admissions policy was revised. One revision provides that when juveniles are arrested on minor charges or detained as children in need of supervision, the detention officials shall attempt for two hours to contact a parent, and if the parent agrees to pick up the minor, then the minor may not be searched or admitted to the secure area of the facility. In addition, the JDC modified the shower area by installing a screen that shields from view all but the head, neck, and lower leg area of a showering youth's body. In response to a state law passed in 2000, which provides that "[n]o person under the age of eighteen detained solely for a curfew violation may be strip-searched," S.D. Codified Laws § 26-11-1.1, the JDC also modified its policy to disallow strip searches of such juveniles, unless the detention officer first fills out a "probable cause" form indicating why the search is warranted.

After discovery, the defendants filed a motion for summary judgment, arguing that strip searches of juveniles who were admitted to the facility was a reasonable administrative procedure, and further asserting that even if the searches were not constitutional, the defendant directors of the JDC were entitled to qualified immunity. The plaintiffs also filed a motion for summary judgment on their Fourth Amendment claim, arguing that the undisputed facts established that the policy of strip-searching all juveniles without individualized suspicion was a violation of clearly established constitutional law.

The district court denied the defendants' motions for summary judgment. The court concluded that the JDC's written search policy in effect in August 1999 was unconstitutional and that the subsequent changes to the policy did not cure the constitutional defects. (Mem. Op. and Order, R. Doc. No. 116, at 11). The court also concluded that the search of Smook in August 1999 violated her constitutional rights.

-4-

(*Id*. at 14). The court further held that Banbury and Cheever were not entitled to qualified immunity because it was "clearly established for several years" prior to the time of the alleged violations that the Fourth Amendment prohibited "the kinds of searches of which Plaintiff and the class complain." (*Id.* at 15).

The district court then granted partial summary judgment for the plaintiffs on the Fourth Amendment claim. The court identified three remaining issues relating to these claims: "(1) what type of injunctive relief is appropriate in this case; (2) what amount of monetary damages are appropriate and how should the class members' damages be determined; (3) what should the ending date be for membership in the first two classes certified by the Court." (*Id*. at 18).

After the district court entered its order, the defendants filed a motion to reconsider based on a decision of the Court of Appeals for the Second Circuit, *N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004), which was filed shortly before the district court granted partial summary judgment in favor of the plaintiffs. The court in *N.G.* held that the disrobing and visual inspection of two juveniles upon their admission to a detention facility was not a violation of the Fourth Amendment. *Id.* at 237. The defendants here argued that the *N.G.* decision supported the constitutionality of the JDC policy, and at least demonstrated that the institution's search policy did not violate clearly established rights in 1999. (Defs.' Mot. for Recons., R. Doc. No. 130, at 11-12). On reconsideration, however, the district court reiterated its holding that the searches violated the constitutional rights of the minors, and that the law was clearly established prior to the searches at issue. (Mem. Op. and Order, R. Doc. No. 140, at 12; Add. at 12).

II.

A.

We begin with the damages claim of the named plaintiff and class representative, Jodie Smook. The district court concluded that the search of Smook upon initial admission to the JDC, which required her to remove her outer clothing but not her undergarments, was unreasonable under the Fourth Amendment. The individual appellants, Banbury and Cheever, contend that the search was reasonable and, alternatively, that even if the search was unreasonable, the law was not clearly established on that point as of August 1999.

The Fourth Amendment proscribes "unreasonable" searches, and "[t]he test of reasonableness . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "A search unsupported by probable cause may be reasonable when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (internal quotations omitted). To determine whether a "special needs" situation justifies a search without individualized suspicion, a court must undertake "a fact-specific balancing of the intrusion . . . against the promotion of legitimate governmental interests." *Id.* at 830.

The most apposite precedent is the Second Circuit's recent opinion in *N.G. v. Connecticut*, where the court applied the foregoing principles to a strip search of juveniles upon initial admission to a detention facility. Judge Newman's opinion for the panel acknowledged that the circuits uniformly have held that adults held for minor offenses may not be strip searched without reasonable suspicion that they possess contraband. 382 F.3d at 232; *see Jones v. Edwards*, 770 F.2d 739, 741-42 (8th Cir. 1985). The Second Circuit concluded, however, that "[s]trip searches of children pose the reasonableness inquiry in a context where both the interests

-6-

supporting and opposing such searches appear to be greater than with searches of adults confined for minor offenses." *N.G.*, 382 F.3d at 232. The State has a greater interest in conducting such a search, because "[w]here the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge, and that protection must be concerned with dangers from others and self-inflicted harm." *Id.* The juvenile's interest in privacy is greater than an adult's, the court thought, because "the adverse psychological effect of a strip search is likely to be more severe upon a child than an adult, especially a child who has been the victim of sexual abuse." *Id.*

After finding no prior appellate decision concerning the reasonableness of strip searches of juveniles in lawful state custody, the Second Circuit tallied the State's legitimate interests in performing such searches: (1) the State has "an enhanced responsibility to take reasonable action to protect [children] from hazards resulting from the presence of contraband where children are confined"; (2) a strip search serves "the protective function of locating and removing concealed items that could be used for self-mutilation or even suicide"; and (3) a strip search may "disclose evidence of abuse that occurred in the home, and awareness of such abuse can assist juvenile authorities in structuring an appropriate plan of care." *Id.* at 236. Then assessing the risks to the well-being of the juveniles and institutional safety from not conducting the searches as compared to the risks to the psychological health of the children from performing the searches, the court held that "strip searches upon initial admission do not violate Fourth Amendment standards." *Id.* at 237. A dissenting judge concluded that the strip searches were unconstitutional because the State had failed to demonstrate a "close and substantial relationship" of the invasive strip searches to a legitimate governmental need. *Id.* at 242 (Sotomayor, J., dissenting).

Smook's constitutional claim is not as strong as that of the juveniles in *N.G.*, because she was not subjected to a full strip search. She was taken to a private restroom by a female staff person, who explained that she would search Smook's

clothes for drugs, drug paraphernalia, and weapons. The staff person directed Smook to remove her shorts, t-shirt, and sandals, and then turned the clothes inside-out, pulled the pockets inside-out, and looked through the sandals to ensure that they did not have a false bottom. (Appellants' App. at 30). Smook remained attired in her undergarments, which she testified placed her at the same level of undress as if she were "at the beach in a swimsuit." (*Id.* at 33). The staff person touched Smook to look under her arms, between her toes, and through her hair and scalp. (*Id.* at 30). After searching the clothing, the staff member returned the clothes to Smook and allowed her to get dressed. (*Id.*).

We conclude that this search was reasonable within the meaning of the Fourth Amendment. The legitimate interests of the State, surveyed by the Second Circuit in *N.G.*, were present in this case and weigh in favor of reasonableness. The search, while intrusive to a degree, presented a lesser invasion of privacy than a full strip search. It has been observed that strip searches requiring a person to disrobe completely have a "uniquely invasive and upsetting nature," *N.G.*, 382 F.3d at 239 (Sotomayor, J., dissenting), and the decision of JDC officials to perform a less intrusive search distinguishes this incident from the close constitutional issue presented in *N.G.* We do not gainsay that requiring a minor disrobe to her undergarments, even in a private room with only one staff member of the same sex, may still be a stressful and disturbing experience. But even the dissenting opinion in *N.G.* did not question that a juvenile detention facility could justify "a potentially-invasive search of some kind – such as a frisk search or a thorough search of all of a detainee's clothing and possessions," *id.* at 244, and there are obvious practical difficulties in conducting a thorough search of a detainee's clothing while the detainee is wearing them. In light of the State's legitimate responsibility to act *in loco parentis* with respect to juveniles in lawful state custody, we conclude that after weighing the special needs for the search against the invasion of personal rights involved, the balance tips in favor of reasonableness. We thus conclude that Banbury and Cheever did not violate Smook's constitutional rights.

Our decision in *Doe v. Little Rock School District*, 380 F.3d 349 (8th Cir. 2004), does not dictate a different conclusion. In that case, our court held that a practice of subjecting secondary public school students to random, suspicionless searches of their persons and belongings by school officials was unconstitutional. As part of the analysis, we observed that "the fruits of the searches at issue here are apparently regularly turned over to law enforcement officials and are used in criminal proceedings against students whose contraband is discovered." *Id.* at 355. We concluded that "[r]ather than acting *in loco parentis*, with the goal of promoting the students' welfare, the government officials conducting the searches are in large part playing a law enforcement role with the goal of ferreting out crime and collecting evidence to be used in prosecuting students." *Id.*

Smook points out that the JDC policy at issue here provides that the law enforcement officer admitting a juvenile to the facility should stay at the JDC until the completion of the search, that any contraband found on a juvenile is to be taken by the police officer, and that "it is the officer's decision regarding further charges." (Appellees' App. at 59). Smook argues that because the searches may produce evidence that an officer could refer to a prosecutor in support of potential criminal charges, the analysis in *Doe* compels a finding that the searches are unreasonable. The *Doe* decision, however, should not be read to establish that a suspicionless search based on "special needs" is *per se* unconstitutional whenever the fruits of the searches may potentially be used in criminal proceedings. In that case, we inferred from the available evidence that the officials conducting searches acted "with the goal of ferreting out crime and collecting evidence," rather than "with the goal of promoting the students' welfare." 380 F.3d at 355.

We do not draw the same inference from the evidence here. Officers already are permitted to search juvenile arrestees for evidence as an incident of the arrest, even for a minor offense, *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354-55 (2001); *id.* at 364 (O'Connor, J., dissenting), and the goals of law enforcement to gather evidence are thus largely satisfied prior to admission at the JDC. We are not

persuaded that the JDC's profession of concern for the welfare of juveniles admitted to the facility is merely a pretextual explanation for searches that are in large part designed to gather evidence for criminal prosecutions. As outlined above and in the decision in *N.G.*, a residential facility like the JDC has sound reasons to act *in loco parentis*, and the incidental possibility that evidence might be discovered and referred to a criminal prosecutor (no example of which is disclosed in this record) is insufficient to render the search of Smook unreasonable.

Because Minnehaha County's appeal regarding liability for the search of Smook is inextricably intertwined with the appeal of the individual defendants, *see Avalos v. City of Glenwood*, 382 F.3d 792, 801 & n.1 (8th Cir. 2004); *Kincade v. City of Blue Springs*, 64 F.3d 389, 394-95 (8th Cir. 1995), we have jurisdiction to consider the county's appeal on that point. For the reasons discussed, we likewise conclude that, assuming there was a direct causal link between the search of Smook and the municipal policy, *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989), the county did not violate Smook's constitutional rights.

Alternatively, assuming for the sake of argument that the district court was correct that there is no constitutional distinction between searches of juveniles in undergarments and searches of juveniles stripped of all clothing, and assuming the district court's conclusion that all such searches without probable cause are unreasonable, we hold that Banbury and Cheever are entitled to qualified immunity from claims for damages arising from the search of Smook in 1999. As of that year, there was no appellate decision from the Supreme Court, this court, or any other federal circuit ruling on the reasonableness of strip searches of juveniles in lawful state custody. See *N.G.*, 382 F.3d at 233.[2] Our court, like many others, had concluded

---

[2]One federal appellate decision in 1992 held that "law enforcement officers *may conduct* a strip search of a juvenile in custody, even for a minor offense, based upon reasonable suspicion to believe that the juvenile is concealing weapons or contraband." *Justice v. City of Peachtree*, 961 F.2d 188, 193 (11th Cir. 1992)

that a strip search of adult offenders without individualized suspicion was unreasonable, but those cases did not consider the different interests involved when the State has responsibility to act *in loco parentis*.

To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, no governing appellate decision had decided how to strike the "reasonableness" balance in the situation of juvenile detainees, and as late as 2004, the Second Circuit concluded not only that the asserted right of juvenile detainees to be free from strip searches was not clearly established, but that the right did not even exist. The conclusion in *N.G.*, at a minimum, was within the range of objectively reasonable determinations that an official might have reached about the lawfulness of strip searches at the JDC in 1999. Even if we have misapprehended how the Supreme Court would resolve the "reasonableness" balance on Smook's claim, we reach the alternative conclusion that Banbury and Cheever are entitled to qualified immunity for allegedly acting in a manner consistent with, or less intrusive than, a practice that the Second Circuit later held to be reasonable and constitutional.

In addition to granting partial summary judgment in favor of Smook, the district court's order also granted partial summary judgment for unnamed class members who,

_____

(emphasis added). The Eleventh Circuit said that "the strip search of a juvenile based on less than probable cause 'instinctively gives us the most pause,'" *id.* (quoting *Bell v. Wolfish*, 411 U.S. at 558), but the court neither reached a holding nor uttered further *dictum* on the constitutionality of strip searching juveniles at a police station, without probable cause, after an arrest for a minor offense. Uncertain *dictum* from a different circuit on a search arising in a different context surely did not establish clearly as of 1999 that strip searches at the Juvenile Detention Center in Minnehaha County were unreasonable.

as the class was defined by the court, were strip searched at the JDC from June 1, 1999, through September 14, 1999. Banbury and Cheever contend that they are also entitled to qualified immunity from suits for damages by the unnamed class members. To review that contention, it appears that we would be required by the Supreme Court's current direction to resolve first whether the searches of the unnamed class members violated the Fourth Amendment, and then, if so, whether the defendants are nonetheless entitled to qualified immunity. *See Brosseau v. Haugen*, 543 U.S. 194, 197-98 & n.3 (2004) (per curiam); *Saucier*, 533 U.S. at 200; *see also Bunting v. Mellen*, 541 U.S. 1019, 1024-25 (2004) (Scalia, J., dissenting from denial of certiorari).

The requirement to resolve the reasonableness of these searches of unnamed class members places us in a quandary. The specific facts underlying the claims are not yet developed, and the reasonableness of a particular search is often highly contextual. We do not know from this record which, if any, of the unnamed class members were searched after removing all of their clothing, what might have led staff members at the JDC to conduct such searches (*e.g.*, whether they simply followed a policy by rote, or whether they exercised discretion based on such factors as whether particular undergarments were unusually capable of concealing contraband), whether any such searches may have involved reasonable suspicion, probable cause, or consent, and so forth. Plaintiffs contend that "[t]he question of whether individual class members were required to be completely nude or nearly nude will be determined among the factual matters during the damages phase of the case," (Appellees' Br. at 14 n.8), yet the entitlement to qualified immunity is an *immunity from suit*, not merely a defense to liability, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and the individual defendants are thus entitled to a decision before the litigation proceeds to that phase.

The posture of the appeal is complicated further by our decision that the named class representative, Smook, has no claim for damages against the defendants. That conclusion typically would disqualify her as a class representative, *see, e.g.*, *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977); *Burris v. First*

*Fin. Corp.*, 928 F.2d 797, 806 (8th Cir. 1991), but given that a class already has been certified, "the class of unnamed persons described in the certification acquire a legal status separate from the interest asserted by [Smook]." *Sosna v. Iowa*, 419 U.S. 393, 398 (1975). This separate legal status means that the dismissal of Smook's claim does not inexorably require dismissal of the class action, *id.* at 399-401; *Rodriguez*, 431 U.S. at 406 n.12; *but cf. Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 899 (8th Cir. 1997), but it also does not mandate that we decide constitutional issues in the abstract or in a context that may be hypothetical. *See Kremens v. Bartley*, 431 U.S. 119, 134 (1977) ("While there are 'live' disputes between unnamed members of the class certified by the District Court, on the one hand, and [defendants], on the other, these disputes are so unfocused as to make informed resolution of them almost impossible.").

Under these unusual circumstances, we decline to pass on the merits of the constitutional claims of the unnamed class members that must be resolved as a first step in determining whether Banbury and Cheever are entitled to qualified immunity from suit. Because we decline to resolve this aspect of the appeal by the individual defendants, we dismiss for lack of jurisdiction that portion of the county's appeal regarding liability for damages to the unnamed class members. On remand, the district court may consider, after pausing to "stop, look, and listen," *id.* at 135, whether the class should be redefined or decertified, *cf. Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982), and whether there is an adequate class representative to replace Smook, if appropriate. *Cf. Howe v. Varity Corp.*, 896 F.2d 1107, 1111 (8th Cir. 1990). If the court concludes that a class should continue to be certified and there is an adequate class representative to continue the action, then the defendants, of course, may renew motions for summary judgment if they wish. We expect that the district court would consider any such motions in light of our conclusions regarding the individual defendants' entitlement to qualified immunity from suit on Smook's claim.

B.

The defendants also appeal the district court's finding of liability on the plaintiffs' claims for injunctive relief with respect to future searches of juveniles detained for "minor offenses." This appeal includes a challenge to the district court's conclusion that the JDC may not, consistent with the Constitution, conduct future searches comparable to the search of Smook. As to that aspect of the appeal from the district court's determinations concerning injunctive relief, we agree with the parties that the issues of law are "inextricably intertwined" with the determination of whether Banbury and Cheever are entitled to qualified immunity on Smook's claim for damages, such that appellate jurisdiction is proper. *See Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997); *Kincade*, 64 F.3d at 394-95. Before we may reach the merits, however, we must first satisfy ourselves that the action for injunctive relief presented a "case or controversy" over which the district court properly exercised Article III jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Having carefully reviewed Smook's complaint with that question in mind, we conclude that she and the class certified by the district court lack standing to seek injunctive relief.

The allegations of the complaint relate entirely to past conduct by the defendants that occurred when Smook and others were arrested for minor offenses in August 1999. The district court's order certifying a class defined the relevant class as encompassing "all persons seeking injunctive relief who, when they [were] under the age of eighteen years old, were charged with minor offenses and were, pursuant to JDC policy strip searched . . . at the Minnehaha County Juvenile Detention Center from June 1, 1999 through September 14, 1999." There is no allegation about the likelihood of future contact with the JDC or future unreasonable searches.

It is well settled that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974).

-14-

There is no allegation in the complaint that Smook or the certified class members are suffering any "continuing, present adverse effects" from searches conducted between June 1 and September 14, 1999. There is no assertion that the plaintiffs expect to commit additional minor offenses in Minnehaha County, or that they are likely to be detained at the JDC. And there is no allegation that if the plaintiffs were detained at the JDC for a minor offense in the future, then they would be unable to take advantage of the two-hour grace period for parental pick-up, which now permits a juvenile to avoid any kind of search when detained for a minor offense. Even if the face of the complaint did include a general assertion of future injury, we think that attempting to anticipate whether any of the plaintiffs would actually be detained and strip searched would take us "into the area of speculation and conjecture." *Id.* at 497; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) ("That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistence on his part."); *Hedgepeth v. Washington Metro. Transit Auth.*, 386 F.3d 1148, 1152 (D.C. Cir. 2004) (Roberts, J.).

Absent a sufficient allegation that Smook and other class members are likely to be strip searched at the JDC in the future, they are "no more entitled to an injunction than any other citizen." *Lyons*, 461 U.S. at 111. And "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [juvenile detention officials] are unconstitutional." *Id.* The Supreme Court has explained that this limitation on the authority of the federal courts does not mean that "undifferentiated claims should not be taken seriously by local authorities," for "the interest of an alert and interested citizen is an essential element of an effective and fair government." *Id.* Indeed, in this very case, the claims by Jodie Smook that she was unreasonably searched at the JDC triggered a modification of the institution's policy on searching minors, and prompted a statewide discussion that culminated in

-15-

legislation prohibiting strip searches, without probable cause, of juveniles detained for curfew violations. But a federal court "is not the proper forum to press such claims unless the requirements for entry and the prerequisites for injunctive relief are satisfied." *Id*. at 112. We therefore conclude that the plaintiffs' claims for injunctive relief should be dismissed for lack of an Article III case-or-controversy.

\* \* \*

For the foregoing reasons, the decision of the district court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

_____