# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 12-1382

———————————————

Mellony Burlison, as parent and next friend of CM and HM, minors; Douglas Burlison, as parent and next friend of CM and HM, minors

*Plaintiffs - Appellants*

v.

Springfield Public Schools; Norm Ridder; Ron Snodgrass; James Arnott

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the Western District of Missouri - Springfield

——————————

Submitted: January 15, 2013
Filed: March 4, 2013

——————————

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

——————————

MURPHY, Circuit Judge.

Mellony and Douglas Burlison brought this action on behalf of their son C.M. under 42 U.S.C. § 1983 and the Missouri Constitution, alleging that Springfield Public Schools (the district), superintendent Norm Ridder, principal Ron Snodgrass, and sheriff James Arnott violated C.M.'s constitutional rights by briefly separating him from his backpack during a drug dog exercise in his high school classroom. The

district court[1] granted summary judgment to the district, its officials, and the sheriff after concluding that the policies used during the drug dog visit "appear[ed] to be reasonable and not in any way a deprivation of a federal right." The Burlisons appeal, and we affirm.

## I.

C.M. was a freshman at the district's Central High School during the 2009 to 2010 school year. In April 2010 two deputies from the Greene County sheriff's department arrived at the school with two drug dogs to conduct a brief survey of randomly selected areas in the building. The survey was conducted in accordance with school police services's standard operating procedure number 3.4.1. On the day of the drug detection activity, C.M. was informed that his science classroom had been chosen to be sniffed by a drug dog. The dog was held by a deputy sheriff thirty to fifty feet from C.M.'s classroom while a school police officer instructed the students and teacher to leave the room. All backpacks, purses, and other personal items were to be left behind. C.M. left his backpack and books in the room and went into the hallway where he could no longer see his belongings. He alleges that his backpack was fully zipped when he left the room.

Once the room was cleared of students, a deputy sheriff took the drug dog into C.M.'s classroom. Video footage shows that the deputy sheriff and drug dog left the classroom after approximately five minutes. During that time the drug dog did not alert to anything. Although district personnel and the deputy sheriff who handled the drug dog testified that no student possessions were searched in this classroom, C.M. stated that after he went back inside he "felt like the pockets [of his backpack] had been unzipped and stuff."

---

[1]The Honorable Richard E. Dorr, United States District Court for the Western District of Missouri.

The director of the school police services department testified that he had contacted the Greene County Sheriff's Department in October 2009 to request that drug detection dogs visit each of the district's high schools during the 2009 to 2010 school year. Sheriff department policy 5-50-5 authorizes the use of canines for the "[r]andom exploratory sniffing of luggage, packages or other inanimate objects . . . in public facilities." After sheriff Arnott received the initial request from the director, he assigned a captain to coordinate the use of drug dogs in the district high schools. That was sheriff Arnott's sole contact with the drug detection procedure, and he was not present at C.M.'s school during the visit of the drug dogs in April 2010.

The drug dog visit to C.M.'s high school was done in accordance with Board of Education policy JFG and school police services's standard operating procedure 3.4.1. Policy JFG was enacted to "balance each student's right to privacy" with "the need to maintain an appropriate learning environment." It permits student property to be "screened in conjunction with law enforcement by using animals trained to locate and/or detect weapons and prohibited drugs." The school police services's procedure allows drug dogs to be used at the district's secondary school buildings "to protect the safety and health of the [d]istrict's faculty, staff and students." It permits dogs to sniff student lockers, desks, backpacks, and similar items when they are not in the possession of students. The procedure states that "once a drug detection dog has completed sniffing an area, the dog handler and drug detection dog will retire from the area." The director of school police services has further clarified that a student's possessions will only be searched if a drug dog has twice alerted on the same property.

District personnel created procedures for drug detection surveys like the April 2010 visit to C.M.'s classroom in order to address a known drug problem in the district. C.M. testified that he knew a lot of high school students were using drugs. District records show that the number of drug incidents in the district from 2000 to 2011 ranged from 89 to 205 per year. A school police officer from C.M.'s high

school testified that he "frequently received reports from students, parents, and teachers about the use of illegal and prescription drugs in the school." He handled drug related incidents on average three or more times per week, leading him to believe that "there was and is a drug problem" at the high school.

The Burlisons filed this action against the district on behalf of their son C.M.[2] under 42 U.S.C. § 1983 and article I, section 15 of the Missouri Constitution. Superintendent Norm Ridder, principal Ron Snodgrass, and sheriff James Arnott were also named as defendants in their individual and official capacities. The Burlisons sought a declaration that C.M.'s constitutional rights had been violated by the search and seizure of his property, a permanent injunction, actual and nominal damages, attorney fees, and other appropriate relief.

On cross motions for summary judgment, the district court granted it to the district and the officials, concluding that the "written policies and procedures . . . appear to be reasonable and not in any way a deprivation of a federal right." While there "may [have been] an issue as to whether C.M.'s belongings were searched" because C.M. had alleged that his backpack had been unzipped when he returned to the classroom, none of the named defendants could be liable because they had not performed the alleged search and neither C.M. nor his backpack had been seized. Ridder, Snodgrass, and Arnott were not individually liable because they had not participated in any alleged constitutional violation or failed to properly supervise subordinates. The claims against Ridder and Snodgrass in their official capacities were dismissed as "redundant to the claims against the [d]istrict," and Arnott was not liable in his official capacity because nothing suggested that he had notice of an unconstitutional policy.

---

[2]The Burlisons also filed on behalf of their daughter H.M., but they state that her claims are moot "because she is no longer a student and . . . [her] only claims were for declaratory and injunctive relief." A suit by another parent was dismissed for failure to prosecute.

The Burlisons appeal, arguing that the district court erred in concluding that C.M.'s belongings had not been seized, that superintendent Ridder and principal Snodgrass were not liable in their official capacities, and that sheriff Arnott was not liable in his individual or official capacities. The Burlisons point out however that they "have not pursued a claim that an unconstitutional search of C.M.'s belongings" occurred since "the proper parties are not in this action." They also do not appeal the district court's determination that Snodgrass and Ridder are not liable in their individual capacities. See Ahlberg v. Chrysler Corp., 481 F.3d 630, 634 (8th Cir. 2007).

II.

The Burlisons first argue that the district court erred in granting summary judgment to the district as well as to Ridder and Snodgrass in their official capacities. They contend that C.M.'s property was seized in violation of the Fourth Amendment and article I, section 15 of the Missouri Constitution, regardless of whether the seizure was completed in accordance with school police services procedure 3.4.1. The district court's grant of summary judgment to the district and the officials is reviewed de novo. AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 971 (8th Cir. 2011). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

The Burlisons' claims against Ridder and Snodgrass in their official capacities are in reality claims against the district. See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). To succeed on their § 1983 claim against the district the Burlisons must prove that the district acted under color of state law in a manner that deprived C.M. of a constitutionally protected federal right. Van Zee v. Hanson, 630 F.3d 1126, 1128 (8th Cir. 2011). The Burlisons also raise a state constitutional claim under article I, section 15 of the Missouri Constitution which "is parallel to and

-5-

co-extensive with the Fourth Amendment." State v. Johnson, 316 S.W.3d 390, 395 (Mo. Ct. App. 2010).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fourteenth Amendment extends this constitutional guarantee to searches and seizures by state officers, Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995), including public school officials, Doe v. Little Rock Sch. Dist., 380 F.3d 349, 352 (8th Cir. 2004). A seizure of property under the Fourth Amendment occurs when there is "some meaningful interference with an individual's possessory interests in that property." Dixon v. Lowery, 302 F.3d 857, 862 (8th Cir. 2002) (quotation marks and citation omitted). Not "every governmental interference with a person's property constitutes a seizure of that property under the Constitution." United States v. Va Lerie, 424 F.3d 694, 702 (8th Cir. 2005) (en banc). We concluded, for example, in Va Lerie that the removal of checked luggage from a bus by a government agent was not a seizure because it did not delay the person's travel or impact his freedom of movement, affect the timely delivery of luggage, or deprive the carrier of custody of the checked bag. Id. at 708.

The Fourth Amendment demands that seizure of property be reasonable, but "what is reasonable depends on the context." New Jersey v. T.L.O., 469 U.S. 325, 337 (1985). A student's privacy interest "is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety." Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 830 (2002). Students do retain Fourth Amendment rights at school, T.L.O., 469 U.S. at 338, but those rights "are different in public schools than elsewhere," Acton, 515 U.S. at 656. That is because schools have a "legitimate need to maintain an environment in which learning can take place." T.L.O., 469 U.S. at 340. Thus, a reasonableness inquiry must consider schools' "custodial and tutelary responsibility for children" and

the fact that students have a "lesser expectation of privacy than members of the population generally." Acton, 515 U.S. at 656–57 (citation omitted).

To determine whether a school's actions violated the Fourth Amendment, the Supreme Court has "conducted a fact-specific balancing of the intrusion on the children's Fourth Amendment rights against the promotion of legitimate governmental interests." Earls, 536 U.S. at 830. In considering the constitutionality of a school policy requiring suspicionless drug testing of students who participate in extracurricular activities, the Supreme Court considered "the nature of the privacy interest allegedly compromised," "the character of the intrusion imposed," and "the nature and immediacy of the government's concerns and the efficacy of the Policy in meeting them." Id. at 830, 832, 834. In Earls, the Court concluded that the school's policy was "a reasonable means of furthering . . . important interest[s] in preventing and deterring drug use among its schoolchildren." Id. at 838.

Assuming that C.M.'s belongings were seized in this case when the school police officer directed that they be left in the classroom for approximately five minutes while the drug dog survey occurred, we conclude that the seizure was part of a reasonable procedure to maintain the safety and security of students at the school. See T.L.O., 469 U.S. at 339. Since C.M. is a high school student, he has a "lesser expectation of privacy" than the general public. Acton, 515 U.S. at 657 (citation omitted). He was only separated from his belongings for a short period of time while the deputy sheriff safely and efficiently completed the drug dog walkabout. Requiring students to be separated from their property during such a reasonable procedure avoids potential embarrassment to students, ensures that students are not targeted by dogs, and decreases the possibility of dangerous interactions between dogs and children. See Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 479 (5th Cir. 1982).

C.M.'s freedoms were not unreasonably curtailed by his brief separation from his possessions because he normally would not have been able to access or move his backpack during class time without permission. In Little Rock, 380 F.3d at 351, we concluded that a school's search policy was unconstitutional where it required all students to leave their belongings in a classroom and allowed school personnel to search each student's property. We noted that a drug dog procedure like the one completed in C.M.'s school in April 2010 would not raise the same type of constitutional issues. Id. at 355. That is because such a drug dog survey is "minimally intrusive, and provide[s] an effective means for adducing the requisite degree of individualized suspicion to conduct further, more intrusive searches." Id. The drug dog procedure at C.M.'s school was the type of minimally intrusive activity which we referenced in Little Rock. C.M. was separated from his backpack only for a short period of time and school personnel were only to search a student's belongings if a drug dog alerted twice on the same property.

The district and its officials have shown an immediate need for a drug dog procedure because there is substantial evidence showing there was a drug problem in district buildings. The Supreme Court has repeatedly emphasized the strong government interest in preventing drug use by students. See, e.g., Earls, 536 U.S. at 834. Drug problems in schools are "serious in terms of size, the kinds of drugs being used, and the consequences of that use both for our children and the rest of us." Id. at 839 (Breyer, J., concurring). That is because "drug use carries a variety of health risks for children, including death from overdose." Id. at 836–37 (majority opinion). C.M. testified that he knew students at his school who used drugs and a school police officer stated that he believed there "was and is a drug problem" at C.M.'s high school. The district also provided records substantiating the number of drug incidents from 2000 to 2011. According to those records the district had 154 drug related incidents during C.M.'s freshman year. The procedures used by district personnel and the deputy sheriff at C.M.'s school in April 2010 reasonably addressed concerns over

drug usage in school in a manner that was minimally intrusive to students and their belongings.

The district court noted that a genuine issue of material fact might exist whether C.M.'s belongings were searched because he testified that his backpack was zipped when he left the room and when "[he] came back . . . [he] felt like the pockets had been unzipped and stuff."  The district court concluded however that the Burlisons could not challenge any alleged search because there was no evidence that the named county or school personnel had searched C.M.'s belongings.  C.M. could not see inside the room, but his possessions were in the location where he had left them when he returned to class.  School and county personnel testified that they did not search C.M.'s belongings, and the record does not reveal who may have touched the zipper on C.M.'s backpack.  The Burlisons concede on appeal that they are not pursuing the alleged search because the "proper parties [are] not in this action."  That is significant because the "Search Clause [of the Fourth Amendment] is wholly distinct from the Seizure Clause, such that courts applying these clauses must understand they provide different protections against government conduct."  Va Lerie, 424 F.3d at 701 (citing Segura v. United States, 468 U.S. 796, 806 (1984)).

The Burlisons also argue that the seizure of C.M.'s belongings was "plainly illegal" because it was not undertaken pursuant to judicial authority and was not supported by individualized suspicion.  The Supreme Court has specifically rejected the need to obtain a warrant in a school setting, however, and instead has stated that the legality of Fourth Amendment searches and seizures in school "should depend simply on the reasonableness, under all the circumstances" of the activities.  T.L.O., 469 U.S. at 341.  The Supreme Court has also rejected the idea that all searches or seizures in a school must be supported by individualized suspicion.  See Acton, 515 U.S. at 653.  Also, in Earls, 536 U.S. at 837, the Court declined to require a school to find individualized suspicion before drug testing students participating in

extracurricular activities because the school was "attempting to prevent and detect drug use by students."

We conclude that the brief separation of C.M. and his belongings was reasonable and did not deprive him of a constitutionally protected right. The district court therefore properly granted summary judgement to the district and to Ridder and Snodgrass in their official capacities.

III.

The Burlisons next argue that the district court erred in granting summary judgment to sheriff Arnott in his individual and official capacities. A government official can be liable in his individual capacity if "a causal link to, and direct responsibility for, the deprivation of rights" is shown. Mayorga v. Missouri, 442 F.3d 1128, 1132 (8th Cir. 2006) (citation omitted). A supervising officer "can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation marks and citations omitted). To succeed on a claim against Arnott in his official capacity the Burlisons must show that "a constitutional violation was committed pursuant to an official 'policy or custom' and that such 'policy [or] custom' was the moving force behind plaintiff's injury." M.Y. v. Special Sch. Dist. No. 1, 544 F.3d 885, 890 (8th Cir. 2008) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694–95) (1978)).

The district court correctly concluded that Arnott is not liable under § 1983 in his individual or official capacity. Arnott did not participate in the drug dog procedure at C.M.'s school and he was not at the school for the drug detection walkabout. See Parrish, 594 F.3d at 1001. He had received a request from the director of school police services in 2009 to have drug dogs visit each of the district's

high schools and assigned the matter to a captain. The resulting drug dog survey at C.M.'s school was conducted pursuant to procedures established by the school's police services and the sheriff's office, and there was no resulting constitutional deprivation. See id. There is also no evidence that Arnott failed to train or supervise the deputies who conducted the drug dog procedure at C.M.'s school. There had been no complaints related to the drug dog surveys before April 2010, and there is no evidence that the sheriff's office should have believed that its procedures or actions were likely to result in a constitutional violation. M.Y., 544 F.3d at 890.

IV.

For these reasons we affirm the judgment of the district court.

LOKEN, Circuit Judge, concurring.

I agree that, if separating C.M. from his backpack for five minutes was a seizure, it was objectively reasonable and thus did not violate C.M.'s Fourth Amendment rights. I therefore join the opinion of the court. I write separately to explain why I also agree with the district court that there was no seizure of C.M.'s personal belongings within the meaning of the Fourth Amendment. Accord Doran v. Contoocook Valley Sch. Dist., 616 F. Supp. 2d 184, 193-94 (D.N.H. 2009).

A Fourth Amendment seizure of property occurs "when there is some meaningful interference with an individual's possessory interests in that property." Jacobsen v. United States, 466 U.S. 109, 113 (1984). "By requiring some *meaningful interference* with an individual's possessory interests in property, the Supreme Court inevitably contemplated excluding *inconsequential interference* with an individual's possessory interests." United States v. Va Lerie, 424 F.3d 694, 706 (8th Cir. 2005) (en banc), (emphasis in original), cert. denied, 548 U.S. 903 (2006). In my view,

-11-

instructing C.M. to leave his backpack and wait in the hall while a drug dog briefly sniffed the classroom was, at most, an inconsequential interference.

In Va Lerie, we concluded that moving a bus passenger's checked luggage before seeking consent to search was not a meaningful interference because it did not delay the passenger's travel plans or freedom of movement, delay delivery of the luggage, or deprive the bus company of its custody of the luggage. Id. at 707-08. In United States v. Clutter, 674 F.3d 980, 984 (8th Cir.), cert. denied, 133 S. Ct. 272 (2012), we concluded that temporary seizure of the defendant's computers while officers applied for a search warrant did not meaningfully interfere with his possessory interests because he was in jail and his father consented to the seizure. Here, the interference with C.M.'s backpack was far less consequential. No defendant physically moved or even touched the backpack, nor did the Burlisons identify any other interference with C.M.'s possessory interests during the five minutes he was separated from the backpack while on school premises.

In considering the objective reasonableness that governs Fourth Amendment issues, it is essential to consider the public school context in which this issue arose. Fourth Amendment protections extend to searches and seizures of students and their belongings by public school officials. New Jersey v. T.L.O., 469 U.S. 325, 336-37 (1985). But because context matters, Fourth Amendment protections "are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656 (1995). "To qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in everyday, compulsory attendance." Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1251 (10th Cir. 2008).

C.M. retained some possessory and privacy interests in his backpack when he brought it to school, like the purse at issue in T.L.O., but his freedom to take his

personal belongings with him wherever he went on school grounds was necessarily limited by the school's "legitimate need to maintain an environment in which learning can take place." 469 U.S. at 340. For example, students may be required to leave personal belongings in lockers to reduce clutter in classrooms and hallways. And, for reasons such as safety or an improved learning environment, students may be told to leave their belongings in the classroom while they temporarily leave the building for a fire drill, or proceed to a science lab or athletic facility in another part of the building. Here, acting on established Board of Education and Sheriff's Department policies, defendants briefly separated a classroom of students from their personal belongings to permit a drug dog to safely sniff the classroom for the presence of illegal drugs. As the court thoroughly explains, the Supreme Court has repeatedly emphasized the importance of dealing with the drug problem in our Nation's schools. In these circumstances, I would affirm because no seizure of C.M.'s backpack occurred. Of course, if the drug dog had alerted and the backpack then been searched, additional Fourth Amendment issues would be presented.

COLLOTON, Circuit Judge, concurring.

I concur in Judge Murphy's opinion for the court. It is unnecessary to decide whether school officials effected a seizure of C.M.'s belongings, because any such seizure was reasonable under the Fourth Amendment. As Judge Loken has chosen to opine that C.M.'s belongings were not seized, however, it is worth noting that there is a substantial argument on the other side.

In *United States v. Jacobsen*, 466 U.S. 109 (1984), the Supreme Court said that "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id*. at 113. The Court held that the standard of "meaningful interference" was satisfied when federal agents took temporary custody of a package from Federal Express at an airport office for investigative purposes, *id*. at 120, even before they conducted their investigation, *id*.

at 124-25, because "the decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a 'seizure,' though not necessarily an unreasonable one." *Id*. at 121 n.18. Similarly, the authorities here separated C.M. from his property, thus depriving him of custody of the backpack, *see United States v. Alvarez-Manzo*, 570 F.3d 1070, 1076 (8th Cir. 2009); *cf. United States v. Va Lerie*, 424 F.3d 694, 702, 708 & n.9 (8th Cir. 2005) (en banc) (no deprivation of custody), and the authorities did so "for their own purposes" of investigating the presence of contraband in the property, as in *Jacobsen*, not to facilitate a fire drill or school assembly unrelated to the property.

Presumably because the "seizure" issue is not an easy one, the Texas Court of Appeals bypassed the issue en route to concluding that a comparable school procedure was constitutionally reasonable. *In re D.H.*, 306 S.W.3d 955, 958 (Tex. App. 2010). The district court in *Doran v. Contoocook Valley School District*, 616 F. Supp. 2d 184 (D.N.H. 2009), although cited above as holding that the procedure at issue effects no seizure of property, addressed only whether *children* (not their belongings) were seized in the course of a school's drug dog operation. *Id*. at 193-94. Insofar as the *Doran* court touched on the separation of children from their personal belongings, the court addressed only whether there was an "*improper* seizure," i.e., an unreasonable one, *id*. at 194 (emphasis added), and relied on the Supreme Court's discussion in *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995), which emphasized that "*the 'reasonableness' inquiry* cannot disregard the schools' custodial and tutelary responsibility for children." *Id*. at 656 (emphasis added).

Given the difficulty of the "seizure" question, it is prudent to resolve this appeal based on the reasonableness of the school's procedure under the circumstances. With these observations, I concur in the opinion of the court.

_____